NEW YORK LIFE INSURANCE COM-
PANY, a corporation, Appellant,

v.

Blanche DICK, Appellee.

No. 15760.

United States Court of Appeals
Eighth Circuit.

Feb. 7, 1958.

Norman G. Tenneson, Fargo, N. D.,
for appellant.

Donald C. Holand, Lisbon, N. D., and
Philip B. Vogel, Fargo, N. D., for ap-
pellee.

Before SANBORN, WOODROUGH
and JOHNSEN, Circuit Judges.

SANBORN, Circuit Judge.

This is an appeal from a judgment for
the plaintiff (appellee) in an action
against the New York Life Insurance
Company for double indemnity benefits
under policies of life insurance. Juris-
diction was based on diversity of citizen-
ship and amount in controversy.

William Dick, a North Dakota farmer,
forty-seven years of age, while alone with
a double-barrel shotgun in the silage shed
of his farm on the morning of January
20, 1955, was twice shot by the gun. The
first shot severely wounded him on the
left side of his chest. The second shot
was in the head and killed him instantly.

At the time of his death, William Dick had two policies of life insurance issued by the New York Life Insurance Company, payable to his wife, Blanche Dick, as beneficiary. The policies were in force. Each contained a double indemnity clause. The clause provided that double indemnity should be payable upon receipt of due proof that the death of the insured "resulted directly, and independently of all other causes, from bodily injury effected solely through external, violent and accidental means," but that such indemnity should not be payable if the insured's death resulted from "self-destruction, whether sane or insane."

Blanche Dick, claiming that the shooting was accidental, demanded double indemnity. She brought this action upon that claim. The company in its answer denied that the insured's death was the result of an accident. As an affirmative defense it alleged that his death resulted from self-destruction.

The company paid to Blanche Dick the full face of the policies. The issue whether or not the insured met his death as the result of an accident was tried to a jury. Since the insured's death obviously resulted from means which were both external and violent, the sole issue at the trial was, as a practical matter, whether the death was or was not accidental. At the close of the evidence, the company moved for a directed verdict on the grounds that the evidence was insufficient to make the issue one of fact for the jury and that it conclusively showed that the death was suicidal. The motion was denied. The jury returned a verdict for the plaintiff. The company moved that the verdict be set aside and that judgment be entered in its favor in accordance with its motion for a directed

verdict, or, in the alternative, that it be granted a new trial because of alleged errors of the court during the trial. The motion was denied, and this appeal followed.

The main question for decision is whether there was an adequate evidentiary basis to make the issue whether the insured's death was accidental one of fact for the jury.

■ The policies in suit are North Dakota contracts, and the applicable substantive law is the law of that State. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.[1]

■ In determining whether the company was entitled to a directed verdict, we must give to the plaintiff the benefit of all reasonable inferences which can be drawn from the evidence, viewed in the aspect most favorable to her. She is not, however, entitled to the benefit of inferences which are unreasonable (Russell v. Turner, 8 Cir., 148 F.2d 562, 565), or which are opposed to the undisputed physical facts. Elzig v. Gudwangen, 8 Cir., 91 F.2d 434, 440 and cases cited.

We find it unnecessary to outline the evidence in complete detail. We have studied it, and the parties are entirely familiar with it. The plaintiff's evidence tended to show that the insured had no motive to commit suicide; that he was a cheerful man, on excellent terms with his wife, family and friends; that he had no financial worries; that he was 5 feet 7 inches tall, weighed about 165 pounds, and was in good physical condition, except for some prostate trouble which "bothered him a little but it wasn't bad"; that he might have kept his shotgun in the barn, loaded and cocked, because of some past trouble with vicious dogs bothering and killing his sheep; that in the

---

1. In Guaranty Trust Co. v. York, 326 U.S. 99, 109, 65 S.Ct. 1464, 1470, 89 L. Ed. 2079, the Supreme Court said:
"* * * The nub of the policy that underlies Erie R. Co. v. Tompkins is that for the same transaction the accident of a suit by a non-resident litigant in a federal court instead of in a State court a block away should not lead to a

substantially different result. And so, putting to one side abstractions regarding 'substance' and 'procedure', we have held that in diversity cases the federal courts must follow the law of the State as to burden of: proof, Cities Service Co. v. Dunlap, 308 U.S. 208, 60 S.Ct. 201, 84 L.Ed. 196 * * *."

small silage shed between the barn and the silo, where his body was found with the shotgun beside it, there was some silage on the floor which might have caused him to slip and fall; that in the evening of the day preceding his death his attitude and actions were normal, and were the same the following morning when he had breakfast with his wife and fourteen-year-old daughter; that after breakfast he got out the automobile so that his wife could take the daughter to school, and then, with his work clothes on, went about his usual farm chores and fed his cattle in the feed lot adjoining the silage shed; that it was after his wife's return from the school and after she had done her housework and was waiting for him to go with her to a cousin's house to help make bologna, that, about 10:30 A.M., she went to the barn to look for him, and found his body lying on its back on the floor of the silage shed; that she ran to the house and notified his brother and a nephew to come at once; that her husband was a hunter, experienced in the use of firearms, and had had the double-barrel shotgun which caused his death for many years; and that at the time of his death he was wearing rubbers and gloves.

There was evidence that the insured was seldom moody, and then for only brief periods; that he was an able-bodied, strong man; and that nothing he had done or said gave any indication that he contemplated suicide.

The defendant's evidence related largely to the physical facts indicating where and how the death occurred and what caused it. The evidence showed that the Sheriff of the County and the Coroner, Dr. Veitch, who was also the insured's physician and a medical examiner for the insurance company, arrived at the farm about 11:00 A.M. on January 20. The Sheriff testified that the body was lying on its back, with the head in the direction of the silo and the feet toward the door leading from the shed to the outside; that the eyes and frontal part of the head were torn off; that he observed a powder burn above the left ear; that the gun was lying alongside the body, about 18 inches away, with the stock toward the feet and the muzzle about at the chest; that the Sheriff took possession of the gun, a twelve-gauge Stevens double-barrel shotgun with two triggers, one ahead of the other; that the front trigger fires the right barrel, and the rear trigger fires the left; that there is a safety device on top of the stock, just behind the device which "breaks" the gun; that the safety device has to be pushed forward before the gun can be fired; that he made various tests with the gun "off safe" to see whether it could be fired by dropping or jarring it, and found that the triggers would not release; that it required about a seven-pound pull to touch off the triggers; that during his investigation in the shed he picked up the gun, "broke" it, and found two discharged shells in the chambers; that he found two 12-gauge loaded shells in the deceased's jacket; that he took possession of the clothing worn by William Dick when he died; that in the silage shed he also saw a screwdriver eight to ten inches long, located about eight or ten inches from the gun and to the left of it; that the gun was dry and clean; that tissue blown from the head was in the southeast corner of the shed and partly on the outside door and the east wall, covering an area of five or six feet, most of it four or five feet from the ground; that there were also shot particles on the wall in several different places, probably six or eight feet from the door leading in from the barn, on the east side of the shed; that he saw no shot on the north wall; that there was a cap lying on the floor near the wall to the right of the head of William Dick; that after the body had been taken to the funeral parlor, he saw the wound in the left side of the chest; that in his opinion the shot that made this wound was from the ground upward; that there were holes in the outside jacket and the shirt corresponding to the location of the chest wound.

The testimony of Dr. Veitch, the Coroner, corroborated that of the Sheriff as

to the location of the body in the shed and the nature and extent of the wounds. He testified that the head wound caused the death, that the chest wound was mortal but not immediately fatal, and that it would shortly have caused Dick's death; that it was terribly painful but would not have caused him to lose consciousness; that the pain must have been unbearable; that the doctor's opinion was that after the chest wound the insured could still have fired the shotgun; that the gun was eight to twelve inches away from the body, and the screwdriver further away; that he observed definite powder marks on the skin of the left forehead in front of the left ear; that "they extended a half inch to an inch, quite a high concentration of a powder burn."

Dr. Veitch also testified that from September 13 to December 30, 1954, he had been treating the insured for "a form of mild to moderate non-specific prostatitis"; that the insured called upon the doctor for treatment twice in September, three times in October, twice in November, and the last time on December 30, when Dick "was in a very fine state of mind and wished me a happy New Year"; that the symptoms of his trouble were ache and pain; that his illness would not prevent him from doing his work; that "He would do his work every day in spite of the misery he was having."

The doctor testified that in connection with the claim of Blanche Dick against the defendant he signed some proofs of death, which, under "Cause of death," stated "Death from self inflicted shotgun wounds, 1. Left chest, 2. Frontal area of head."

There was testimony that an examination of the jacket worn by the insured showed powder marks on the front near the hole where the shot entered.

There was other testimony tending to support the defendant's theory that the death of the insured was not an accident.

There are certain facts which we think were definitely established by the evidence: 1. That the insured was a man of good character and reputation, who had no adequate reason for taking his own life. 2. That the wounds inflicted upon him came from shots from his own shotgun, which he must himself have loaded and cocked. 3. That the shots came from in front of and in close proximity to his body. 4. That the shotgun was in good working order, was off safety and was ready to be fired when it was fired. 5. That neither barrel could have been fired unless someone or something either pulled or pushed one of the triggers. 6. That no person other than the insured could have pulled or pushed a trigger, and that there was nothing to account for one barrel of the gun being first fired accidentally into his chest and the second barrel being then fired accidentally into his head. The improbability of his being able to pull the triggers with bulky gloves on is offset by the strong probability that the screwdriver was used to push the triggers, and that he could not otherwise have reached the triggers so as to inflict the wounds he received.

One can believe that even an experienced hunter might accidentally shoot himself once, but the asserted theory that he could accidentally shoot himself first with one barrel and then with the other stretches credulity beyond the breaking point.

The Supreme Court of North Dakota has held that proof of death by gunshot wound plus the presumption of accidental death makes a prima facie case that death was accidental, and "that a verdict founded upon such proof and presumption would not be set aside unless the facts and circumstances surrounding the death could not be reconciled with any reasonable theory of accidental or nonintentional injury." Svihovec v. Woodmen Accident Co., 69 N.D. 259, 285 N.W. 447, 449.

If the facts and circumstances surrounding the death of the insured can be reconciled with any reasonable theory of accidental injury the judgment appealed from should be affirmed, but if they cannot the judgment should be reversed.

Our conclusion is that the infliction of two wounds in succession, one in the left side in close proximity to the heart, and the other in the head, cannot be reconciled with any reasonable theory of accident, and that, under the evidence, the question whether the death was accidental was not a question of fact for the jury. Compare, Burkett v. New York Life Ins. Co., 5 Cir., 56 F.2d 105, and Svihovec v. Woodmen Accident Co., supra.

The judgment is reversed with directions to enter a judgment dismissing the complaint.