· DICK *v.* NEW YORK LIFE INSURANCE CO. ·

No. 58. Argued January 12, 1959.—Decided May 18, 1959.

. *Philip B. Vogel* argued the cause for petitioner. With him on the brief were *Pershing Boe* and *Donald C.* *Holand.*

*Norman G. Tenneson* argued the cause for respondent. With him on the brief was *Harold W. Bangert.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The question in this case is whether the Court of Appeals for the Eighth Circuit, under the applicable principles hereinafter discussed, properly held that it was error to submit to a jury's determination whether an insured died as a result of suicide or accident.

Petitioner is the beneficiary of two policies issued by respondent in 1944 and 1949 insuring the life of her now-deceased husband, William Dick. Each policy contained a clause which provided that double indemnity would be payable upon receipt of proof that the death of the insured "resulted directly, and independently of all other causes, from bodily injury effected solely through external violent and accidental means," but that the double indemnity would not be payable if the insured's death resulted from "self-destruction, whether sane or insane."

Mr. Dick met his death while alone in the silage shed of his farm. The death resulted from two wounds caused by the discharge of his shotgun.[1] Petitioner filed proofs of death but respondent rejected her claim for double indemnity payments on the ground that Mr. Dick had committed suicide. Petitioner then filed suit in the North Dakota courts. Her complaint set forth the policies in issue, the facts surrounding her husband's death, an allegation that the death was accidental, and a demand for payment. Respondent removed the case to the United States District Court for the District of North Dakota on the grounds of diversity of citizenship and jurisdictional amount. It then filed an answer to the complaint in which it set up suicide as an affirmative defense to the demand for double indemnity payments. Respondent admitted liability for the face amounts of the policies ($7,500) and no issue is presented concerning those amounts.

Trial proceeded before the district judge and jury. The evidence showed that the Dicks, who had been happily married since 1926, lived on a farm near Lisbon, North

---

[1] The gun was a Stevens, 12 gauge, double barreled shotgun with two triggers placed one behind the other. It weighed approximately seven pounds. It had an over-all length of 46 inches and measured 32 inches from muzzle to triggers.

Dakota, where they raised sheep, cattle and field crops. Five of the six quarter sections of the farm were unmortgaged and Mr. Dick, who was not known to have any financial problems, had nearly $1,000 in the bank. He was known as a "husky," "strong," "jolly" man who was seldom moody. "If he had anything on his chest, he would get it off and forget about it." Dick got along well with his neighbors and was well liked in the community. He was 47 at the time of his death. He was five feet seven inches tall, weighed approximately 165 pounds, and was generally healthy. The coroner, who was also Dick's personal doctor, testified that Dick was a mature, muscular, physically able workman who, three weeks before his death, was bright and cheerful. About a year and a half before his death, Mr. Dick visited the doctor and complained that he felt tired and pepless. His condition was diagnosed as mild to moderate non-specific prostatitis for which he received sulfa treatments and hormone shots. But the record is devoid of evidence that the condition was serious or particularly painful or that Mr. Dick was especially concerned with it. The Dicks reared five children. One daughter still lived with them and attended high school in nearby Elliott. Dick got along well with his whole family.

The evening before he died, the family returned from Elliott and ate ice cream and watched television together. Mr. Dick helped his daughter with a school problem in general science explaining to her the intricacies of a transformer. He slept soundly that night. He intended to help his cousin—a neighbor—make sausage the following day. He arose the next morning, milked the cows, ate a hearty breakfast, and spoke with his wife about their plans for the day. He said nothing to indicate that he contemplated doing anything out of the ordinary. About 8:30 a. m., Mrs. Dick drove their daughter to school. Mr. Dick backed the car out of the garage for his wife and said

goodbye in a normal way. He was then in the process of feeding milk to the pigs and silage to the cattle.

Mrs. Dick returned in about a half hour and proceeded to work in the house. Later, when she thought it was time to leave for the cousin's house, she went to locate Mr. Dick. She walked to the barn and called for him but there was no answer. She then went to the little 8 foot by 12 foot silage shed adjacent to the barn and saw Mr. Dick lying on the floor. He was fully clothed for the zero weather Lisbon was then experiencing and he wore bulky gloves and a heavy jacket which was fully zipped up. Near him lay his shotgun. A good part of his head appeared blown off and she knew from his appearance that he was dead. She hurriedly returned to the house and called Mr. Dick's brother who lived nearby. He came immediately and at Mrs. Dick's direction went to the silage shed. There he saw Mr. Dick lying with his head to the northwest and his feet to the southeast of the shed. The body was along the south wall with the feet near the corner. Later, when he examined the shed more closely, he found a concentration of shotgun pellets high in the northwest corner of the shed and other pellets four to five feet from the floor in the southeast corner. He also noticed a sprinkle of frozen silage on the floor of the shed and on the steps leading to the door from the shed.

James Dick, the deceased's nephew, also responded to Mrs. Dick's call. He stated that upon arriving at the Dicks' house, he saw a tub newly filled with ground corn in the silage yard and that normally his uncle fed silage with a topping of ground corn to the cattle. He also stated that the cattle were just then finishing the silage presumably laid out by Mr. Dick before his death.

At about 11 a. m., the sheriff arrived. Mr. Dick was still lying where he had died. The sheriff examined Mr. Dick's shotgun and found two discharged shells in its chamber. The gun was dry and clean and there were no

bloodstains on it or on the gloves which Dick was still wearing. The sheriff also noticed some of the shot patterns found by Dick's brother and saw some brain tissue splattered on the southeast corner. He found a screwdriver lying on the floor about a foot from the gun. The Dicks used the screwdriver to open and close the door to the silage shed because the doorknob was missing.

Soon thereafter the coroner arrived. He testified that Mr. Dick's body contained a shotgun wound on the left side and one on the head. The body wound was mortal, but not immediately fatal. It consisted of a gouged out wound on the left lateral chest wall which removed skin, fat, rib muscles and portions of rib from the body. In addition, other ribs were fractured and Dick's left lung was collapsed. In the coroner's opinion, it was the type of wound which would have had to result in immense pain, although it probably would not have made it impossible for Dick again to discharge the gun. The wound to the head caused immediate death. According to the testimony of the sheriff and a member of the Fargo police department, both wounds were received from the front. In the sheriff's opinion, the chest wound was received from an upward shot into Dick's body, but this testimony conflicted with another statement of the sheriff indicating that the wound was received from a downward shot.

It was clear from the testimony that Mr. Dick was an experienced hunter. Petitioner testified that he kept the shotgun in the barn because of attacks on his sheep by vicious dogs during the preceding year. A number of the sheep had been killed in this manner. In addition, Dick had mentioned seeing foxes near the barn. Mrs. Dick testified that when her husband went hunting, he sometimes borrowed his father's gun because he didn't trust his own. She was with him once when the gun wouldn't fire and had been told that occasionally it fired accidentally. In addition, Dick's brother testified that while hunting

with Dick he heard a shot at an unexpected time which Dick explained as an accidental discharge that occurred "once in a while." The gun was over 26 years old.

The sheriff testified that after the death he tested Dick's gun by cocking and dropping it a number of times.[2] The triggers did not release on any of these occasions. The sheriff also explained that the gun had a safety and could not discharge with the safety on. The safety was off during each of his tests. Finally, the sheriff stated that each trigger had approximately a seven-pound trigger pull.

No suicide notes were found. Mr. Dick had said nothing to his relatives or friends concerning suicide. He left no will.

At the conclusion of the evidence, respondent unsuccessfully moved for a directed verdict. The court charged the jury that under state law accidental death should be presumed and that respondent had the burden to show by a fair preponderance of the evidence that Dick committed suicide. The jury returned a verdict of $7,500 for petitioner. Respondent's motions for judgment notwithstanding the verdict and for new trial were denied.

In this Court and before the Court of Appeals, both parties assumed that the propriety of the District Court's refusal to grant respondent's motions was a matter of North Dakota law. Under that law, it is clear that under the circumstances present in this case a presumption arises, which has the weight of affirmative evidence, that death was accidental. *Svihovec* v. *Woodmen Accident*

---

[2] The sheriff stated that he did not "pretend to be an expert as far as shotguns are concerned." His tests consisted of dropping the gun with the muzzle down ten times from a height of ten inches and holding the gun with the butt down about ten inches from the floor and dropping it on a board eight or ten times. He also placed the gun in a normal shooting position against his shoulder and swung the barrel against an obstacle three or four times.

*Co.,* 69 N. D. 259, 285 N. W. 447. See *Paulsen v. Modern Woodmen of America,* 21 N. D. 235, 130 N. W. 231; *Clemens* v. *Royal Neighbors of America,* 14 N. D. 116, 103 N. W. 402; *Stevens* v. *Continental Casualty Co.,* 12 N. D. 463, 97 N. W. 862.[3] Proof of coverage and of death by gunshot wound shifts the burden to the insurer to establish that the death of the insured was due to his suicide. *Svihovec v. Woodmen Accident Co., supra.* Under North Dakota law, this presumption does not disappear once the insurer presents any evidence of suicide. *Ibid.* Rather, the presumed fact (accidental death) continues and a plaintiff is entitled to affirmative instructions to the jury concerning its existence and weight.[4] This is not to say that under North Dakota law the presumption of accidental death may not be overcome by so much evidence that the insurer is entitled to a directed verdict. For it is clear that where "there is no evidence in the record that can be said to be inconsistent with the conclusion of death by suicide," or "the facts and circumstances surrounding the death [can] not be reconciled with any reasonable theory of accidental or nonintentional injury," the state court may direct a verdict for the insurer even though the insurer is charged with the burden of proving that death was caused by suicide.[5] These state rules determine when

---

[3] This statement of the presumption and its weight accords with the requirements of N. D. Rev. Code, 1943, § 31–1101, which provides:

"A presumption, unless declared by law to be conclusive, may be controverted by other direct or indirect evidence but unless so controverted, the jurors are bound to find according to the presumption."

[4] Respondent's argument below that the court should adopt the "modern" rule on the effect of presumptions, see, *e. g.,* 9 Wigmore On Evidence (3d ed. 1940) § 2491, was rejected. The "modern" rule was applied by this Court in *New York Life Ins. Co.* v. *Gamer,* 303 U. S. 161, a decision predating *Erie R. Co.* v. *Tompkins,* 304 U. S. 64. For the subsequent history of the *Gamer* case, see 106 F. 2d 375.

[5] *Svihovec* v. *Woodmen Accident Co., supra; Clemens* v. *Royal Neighbors of America, supra.*

the evidence in a "suicide" case is sufficient to go to a jury. They are not directed at determining when the presumption of accidental death is rebutted, and thus excised from the case, because, as stated above, the presumed fact of accidental death continues throughout the trial and has the weight of affirmative evidence.

The Court of Appeals, in its opinion, reviewed the evidence in detail and resolved at least one disputed point in respondent's favor. It found, as "definitely established by the evidence," that "neither barrel [of the shotgun] could have been fired unless someone or something either pulled or pushed one of the triggers." It stated that "[o]ne can believe that even an experienced hunter might accidentally shoot himself once, but the asserted theory that he could accidentally shoot himself first with one barrel and then with the other stretches credulity beyond the breaking point." [6] And it concluded that the facts and circumstances could not "be reconciled with any reasonable theory of accident, and that, under the evidence, the question whether the death was accidental was not a question of fact for the jury." Judgment was reversed with directions to dismiss the complaint. 252 F. 2d 43. We granted certiorari, 357 U. S. 925.

Lurking in this case is the question whether it is proper to apply a state or federal test of sufficiency of the evidence to support a jury verdict where federal jurisdiction

---

[6] The Court of Appeals admitted the improbability of Dick's being able to pull the triggers with bulky gloves on but believed that this was offset by the probability that he used the screwdriver to push the triggers. This resolution of the facts seems strained indeed. The presence of the screwdriver was accounted for by testimony indicating that it was used to open the silage shed door. And the jury could reject as improbable the court's implicit theory that a man mortally wounded in the chest and bulkily clothed could hold a heavy shotgun at arm's length and shoot off his head particularly when he was wearing heavy gloves that could only be inserted in the trigger guard with difficulty.

is rested on diversity of citizenship. On this question, the lower courts are not in agreement. Compare *Rowe* v. *Pennsylvania Greyhound Lines,* 231 F. 2d 922; *Cooper* v. *Brown,* 126 F. 2d 874; *Lovas* v. *General Motors Corp.,* 212 F. 2d 805, with *Davis Frozen Foods* v. *Norfolk Southern R. Co.,* 204 F. 2d 839; *Reuter* v. *Eastern Air Lines,* 226 F. 2d 443; *Diederich* v. *American News Co.,* 128 F. 2d 144. And see Morgan, Choice of Law Governing Proof, 58 Harv. L. Rev. 153, 174, and 5 Moore's Federal Practice (2d ed. 1951) § 38.10. But the question is not properly here for decision because, in the briefs and arguments in this Court, both parties assumed that the North Dakota standard applied.[7] Moreover, although the Court of Appeals appears to have applied the state standard, that court did not discuss the issue. Under these circumstances, we will not reach out to decide this important question particularly where, in the context of this case, the two standards are substantially the same.[8] A decision as to which standard should be applied can well be left to another case where the question is briefed and argued. This case can be decided on the simple issue stated at the outset of the opinion.

In our view, the Court of Appeals improperly reversed the judgment of the District Court. It committed its basic error in resolving a factual dispute in favor of respondent that the shotgun would not fire unless someone or something pulled the triggers. Petitioner's evidence on this score, despite the "tests" performed by the sheriff, could support a jury conclusion that the gun might have

---

[7] Respondent argued that the North Dakota rule on presumptions should be abandoned in favor of the "modern" rule, see note 4, *supra,* but the record does not show that it argued for the application of the federal standard of sufficiency of the evidence.

[8] Compare *Brady* v. *Southern R. Co.,* 320 U. S. 476, 479–480, and *Bailey* v. *Central Vermont R. Co.,* 319 U. S. 350, 353, with *Svihovec* v. *Woodmen Accident Co., supra.*

fired accidentally from other causes. Once an accidental discharge is possible, a jury could rationally conceive of a number of explanations of accidental death which were consistent with evidence which the jury might well have believed showed the overwhelming improbability of suicide. The record indisputably shows lack of motive—in fact there is affirmative evidence from which the jury could infer that Dick was a most unlikely suicide prospect. He was relatively healthy, financially secure, happily married, well liked, and apparently emotionally stable. He left nothing behind to indicate that he had committed suicide and nothing in his conduct before death indicated an intention to destroy himself. The timing of the death, while in the midst of normal chores and immediately preceding a planned appointment with neighbors, militates against such a conclusion. Dick's presence in the shed and the accessibility of the gun are explicable in view of the fact that dogs had previously attacked his sheep and the fact that the door in the shed provided a convenient exit to the adjoining fields. And a jury could well believe it improbable that a man would not even bother to remove his bulky gloves, or thick jacket, when he intended to commit suicide even though those articles of clothing made it difficult to turn the gun on himself.

In a case like this one, North Dakota presumes that death was accidental and places on the insurer the burden of proving that death resulted from suicide. *Stevens* v. *Continental Casualty Co., supra; Paulsen* v. *Modern Woodmen of America, supra.* Under the *Erie* rule;[9] presumptions (and their effects) and burden of proof are "substantive" and hence respondent was required to shoulder the burden during the instant trial. *Palmer* v. *Hoffman,* 318 U. S. 109; *Cities Service Oil Co.* v. *Dunlap,* 308 U. S. 208. And see *Balchunas* v. *Palmer,* 151 F. 2d

---

[9] *Erie R. Co.* v. *Tompkins,* 304 U. S. 64.

842; *Sylvania Electric Products* v. *Barker*, 228 F. 2d 842; *Matsumoto* v. *Chicago & N. W. R. Co.*, 168 F. 2d 496. After all the evidence was in, the district judge, who was intimately concerned with the trial and who has a first-hand knowledge of the applicable state principles, believed that the case should go to the jury. Under all the circumstances, we believe that he was correct and that reasonable men could conclude that the respondent failed to satisfy its burden of showing that death resulted from suicide.

*Reversed.*

MR. JUSTICE HARLAN took no part in the consideration or decision of this case.

MR. JUSTICE STEWART, concurring.

I concur in the judgment, believing that the district judge correctly followed applicable North Dakota law in submitting this case to the jury. Not having been a member of the Court when the petition for certiorari was granted, 357 U. S. 925, I consider it inappropriate now to express a view as to the wisdom of bringing here a case like this.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE WHITTAKER joins, dissenting.

On several occasions I have stated the reasons for my adherence to the traditional practice of the Court not to note dissent from the Court's disposition of petitions for certiorari.[1] Different considerations apply once a case is decided.

---

[1] *E. g., Maryland* v. *Baltimore Radio Show, Inc.*, 338 U. S. 912; *Bondholders, Inc.*, v. *Powell*, 342 U. S. 921; *Chemical Bank & Trust Co.* v. *Group of Institutional Investors*, 343 U. S. 982; *Rosenberg* v. *United States*, 344 U. S. 889.

Establishment of intermediate appellate courts in 1891 [2] was designed by Congress to relieve the overburdened docket of the Court.[3] The Circuit Courts of Appeals were to be equal in dignity to the Supreme Courts of the several States.[4] The essential purpose of the Evarts Act was to enable the Supreme Court to discharge its indispensable functions in our federal system by relieving it of the duty of adjudication in cases that are important only to the litigants.[5] The legislative history of the Evarts Act demonstrates that it was clear in 1891 no less than today that litigation allowed to be brought into the federal courts solely on the basis of diversity of citizenship is rarely of moment except to the parties.[6] The Act provided, therefore, that in diversity cases "the judgments or decrees of the circuit courts of appeals shall be final." [7] In a provision which Senator Evarts referred to as a "weakness" in the Act,[8] this Court was given the discretionary power to grant certiorari in these cases, to be exercised if some question of general interest, outside the limited scope of an ordinary diversity litigation, was also involved.[9]

Any hesitance which Senator Evarts may have felt was not justified by the early history of use of this certiorari power. The Court, mindful of the reasons for the restriction, so long and eagerly sought by the Court itself, on its obligatory jurisdiction, and faithful to the complementary obligation imposed upon it by its newly

[2] Act of March 3, 1891, 26 Stat. 826 (commonly known as the Evarts or Circuit Courts of Appeals Act).

[3] H. R. Rep. No. 1295, 51st Cong., 1st Sess. 3.

[4] *Ibid.*

[5] See 21 Cong. Rec. 3403–3405, 10220–10222; 22 Cong. Rec. 3585.

[6] *Ibid.*

[7] 26 Stat. 828.

[8] 21 Cong. Rec. 10221.

[9] 26 Stat. 828.

conferred power to control its docket, exercised the greatest restraint and caution in granting certiorari in cases resting solely on diversity of citizenship.[10]

Time and again in the years immediately following the passage of the Evarts Act this Court stated that it was only in cases of "gravity and general importance" or "to secure uniformity of decision" that the certiorari power should be exercised.[11] Mr. Justice Brewer explained the Court's wariness in granting certiorari in terms of the purpose of the Act:

> "Obviously, a power so broad and comprehensive, if carelessly exercised, might defeat the very thought and purpose of the act creating the courts of appeal. So exercised it might burden the docket of this court with cases which it was the intent of Congress to terminate in the Courts of Appeal, and which, brought here, would simply prevent that promptness of decision which in all judicial actions is one of the elements of justice." [12]

In order to justify the establishment of the Circuit Courts of Appeals it was necessary to view certiorari as

> "a power which will be sparingly exercised, and only when the circumstances of the case satisfy us that

---

[10] See the expressions of the necessity of restraint in granting writs of certiorari which the Court voiced in *Lau Ow Bew,* 141 U. S. 583; *In re Woods,* 143 U. S. 202; *Lau Ow Bew* v. *United States,* 144 U. S. 47; *American Construction Co.* v. *Jacksonville, T. & K. W. R. Co.,* 148 U. S. 372; *Forsyth* v. *Hammond,* 166 U. S. 506; *Fields* v. *United States,* 205 U. S. 292; *United States* v. *Rimer,* 220 U. S. 547. On March 27, 1893, two years after the enactment of the Evarts Act, the Court could write that only two petitions for certiorari had been granted. *American Construction Co.* v. *Jacksonville, T. & K. W. R. Co., supra,* at 383.

[11] See cases cited, note 10, *supra.*

[12] *Forsyth* v. *Hammond,* 166 U. S. 506, 513.

the importance of the question involved, the necessity of avoiding conflict between two or more Courts of Appeal, or between Courts of Appeal and the courts of a State, or some matter affecting the interests of this nation in its internal or external relations, demands such exercise." [13]

These considerations have led the Court in scores of cases to dismiss the writ of certiorari even after oral argument when it became manifest that the writ was granted under a misapprehension of the true issues.[14] Cases which raised as their sole question the sufficiency of evidence for submission to a jury were not regarded as complying with the standards necessitated by the purposes of

---

[13] *Id.*, at 514–515.

[14] In *Rice* v. *Sioux City Memorial Park Cemetery, Inc.*, 349 U. S. 70, after listing some sixty relevant cases, this Court said:

"Only in the light of argument on the merits did it become clear in these numerous cases that the petitions for certiorari should not have been granted. In some instances an asserted conflict turned out to be illusory; in others, a federal question was wanting or decision could be rested on a non-federal ground; in a number, it became manifest that the question was of importance merely to the litigants and did not present an issue of immediate public significance." 349 U. S., at 79, note 2.

In an earlier case Mr. Justice Stone, in a dissent joined by Mr. Justice Brandeis, had written:

"It thus appears that the construction of the statute which we were asked to review is not in the case, and even if it were, it is of local significance only. The conflict of decisions asserted is not shown. Plainly the question is not of such general interest or importance as under the rules and practice of this Court warrants its review upon certiorari. For these reasons it is the duty of this Court to dismiss the writ as improvidently granted." *Washington Fidelity National Ins. Co.* v. *Burton*, 287 U. S. 97, 100, 101–102. See also *United States* v. *Knight*, 336 U. S. 505, 509 (dissenting opinion). Nor need we rummage in the recesses of our memories: see *Triplett* v. *Iowa*, 357 U. S. 217; *Hinkle* v. *New England Mutual Ins. Co.*, 358 U. S. 65; *Joseph* v. *Indiana*, 359 U. S. 117.

the Evarts Act for limiting the power of review by certiorari.[15]

To strengthen further this Court's control over its docket and to avoid review of cases which in the main raise only factual controversies, Congress in 1916 made cases arising under the Federal Employers' Liability Act final in the Courts of Appeals, reviewable by this Court only when required by the guiding standards for exercising its certiorari jurisdiction.[16] The Senate Report which accompanied this bill to the floor of the Senate suggested that this change would allow the Supreme Court more time for "expeditious determination of those [cases] having real substance." [17]

In 1925 Congress enacted the "Judges' Bill," [18] called such because it was drafted by a committee of this Court composed of Van Devanter, McReynolds, and Sutherland, JJ.[19] At the hearings on the bill these Justices and Mr. Chief Justice Taft explained the bill and also the Court's past practice in respecting the limitations

---

[15] See *Houston Oil Co.* v. *Goodrich,* 245 U. S. 440. In *Lutcher & Moore Lumber Co.* v. *Knight,* 217 U. S. 257, 267–268, the Court said: "The great purpose of the act of 1891, however, to which all its provisions are subservient, is to distribute the jurisdiction of the courts of the United States, and thus to relieve the docket of this court by casting upon the Circuit Courts of Appeal the duty of finally deciding the cases over which the jurisdiction of those courts is by the act made final. The power to certiorari in accordance with the act, in its essence, is only a means to the end that this imperative and responsible duty may be adequately performed."

[16] Act of Sept. 6, 1916, § 3, 39 Stat. 727.

[17] S. Rep. No. 775, 64th Cong., 1st Sess. 3. See also H. R. Rep. No. 794, 64th Cong., 1st Sess. 3.

[18] Act of Feb. 13, 1925, 43 Stat. 936.

[19] For a summary of the history of the bill see Frankfurter and Landis, The Business of the Supreme Court, 273–280. The authors also analyze the Act. *Id.,* at 280–294.

of its certiorari jurisdiction.[20]  These authoritative expositions and assurances to Congress, on the basis of which Congress sharply restricted the Court's obligatory jurisdiction, admit of no doubt, contain no ambiguity.  Mr. Chief Justice Taft said:

> "No litigant is entitled to more than two chances, namely, to the original trial and to a review, and the intermediate courts of review are provided for that purpose.  When a case goes beyond that, it is not primarily to preserve the rights of the litigants.  The Supreme Court's function is for the purpose of expounding and stabilizing principles of law for the benefit of the people of the country, passing upon constitutional questions and other important questions of law for the public benefit.  It is to preserve uniformity of decision among the intermediate courts of appeal." [21]

The House Report, in recommending to the House of Representatives passage of the bill, stated the matter succinctly:

> "The problem is whether the time and attention and energy of the court shall be devoted to matters of large public concern, or whether they shall be con-

---

[20] Hearings before the Committee on the Judiciary of the House of Representatives on H. R. 10479, 67th Cong., 2d Sess.; Hearing before a Subcommittee of the Senate Committee on the Judiciary on S. 2060 and S. 2061, 68th Cong., 1st Sess.; Hearing before the Committee on the Judiciary of the House of Representatives on H. R. 8206, 68th Cong., 2d Sess.

[21] Hearings before the Committee on the Judiciary of the House of Representatives on H. R. 10479, 67th Cong., 2d Sess. 2.  Writing for the Court in *Magnum Import Co.* v. *Coty*, 262 U. S. 159, 163, Mr. Chief Justice Taft said: "The jurisdiction [to review decisions of the Courts of Appeals] was not conferred upon this Court merely to give the defeated party in the Circuit Court of Appeals another hearing.".

sumed by matters of less concern, without especial general interest, and only because the litigant wants to have the court of last resort pass upon his right." [22]

Though various objections to certain jurisdictional changes worked by the bill were voiced on the floor of the Senate, even critical Senators recognized the great difference between the Supreme Court and other appellate tribunals. Thus Senator Copeland:

"The United States Supreme Court is one of the three great coordinate branches of the Government, and its time and labor should, generally speaking, be devoted to matters of general interest and importance and not to deciding private controversies between citizens involving no questions of general public importance." [23]

In correspondence between Senator Copeland and Mr. Chief Justice Taft, the latter wrote: "The appeal to us should not be based on the right of a litigant to have a second appeal." [24]

This understanding of the role of the Supreme Court and the way in which it is to be maintained in observing the scope of certiorari jurisdiction, are clearly set forth in a contemporary exposition by Mr. Chief Justice Taft of the purposes of the Judiciary Act of 1925:

"The sound theory of that Act [Act of 1891] and of the new Act is that litigants have their rights sufficiently protected by a hearing or trial in the courts of first instance, and by one review in an intermediate appellate Federal court. The function of the Supreme Court is conceived to be, not the remedying of a particular litigant's wrong, but the considera-

[22] H. R. Rep. No. 1075, 68th Cong., 2d Sess. 2.

[23] 66 Cong. Rec. 2755.

[24] Id., at 2920.

tion of cases whose decision involves principles, the application of which are of wide public or governmental interest, and which should be authoritatively declared by the final court." [25]

Questions of fact have traditionally been deemed to be the kind of questions which ought not to be recanvassed here unless they are entangled in the proper determination of constitutional or other important legal issues. In *Newell v. Norton,* 3 Wall. 257, Mr. Justice Grier stated the considerations weighing against Supreme Court review of factual determinations: "It would be a very tedious as well as a very unprofitable task to again examine and compare the conflicting statements of the witnesses in this volume of depositions. And, even if we could make our opinion intelligible, the case could never be a precedent for any other case, or worth the trouble of understanding." 3 Wall., at 267. And he issued this caveat: "Parties ought not to expect this court to revise their decrees merely on a doubt raised in our minds as to the correctness of their judgment, on the credibility of witnesses, or the weight of conflicting testimony." 3 Wall., at 268. In *Houston Oil Co. v. Goodrich,* 245 U. S. 440, certiorari was dismissed as improvidently granted after it became apparent that the only question in the case was the "propriety of submitting" certain questions to the jury and this "depended essentially upon an appreciation of the evidence." 245 U. S., at 441. Testifying before the Senate Judiciary Committee in hearings concerning the Judges' Bill, Mr. Justice Van Devanter related a similar incident.[26] The proper use of the dis-

---

[25] Taft, The Jurisdiction of the Supreme Court Under the Act of February 13, 1925, 35 Yale L. J. 1, 2 (1925).

[26] Hearing before a Subcommittee of the Senate Committee on the Judiciary on S. 2060 and S. 2061, 68th Cong., 1st Sess. 31.

cretionary certiorari jurisdiction was on a later occasion thus expounded by Mr. Chief Justice Hughes:

> "Records are replete with testimony and evidence of facts. But the questions on certiorari are questions of law. So many cases turn on the facts, principles of law not being in controversy. It is only when the facts are interwoven with the questions of law which we should review that the evidence must be examined and then only to the extent that it is necessary to decide the questions of law.
>
> "This at once disposes of a vast number of factual controversies where the parties have been fully heard in the courts below and have no right to burden the Supreme Court with the dispute which interests no one but themselves." [27]

What are the questions which petitioner here presses upon us? The petition for certiorari sets forth as the questions presented: (1) was petitioner deprived of her constitutional right to a jury trial guaranteed by the Seventh Amendment? (2) did the Court of Appeals refuse to follow North Dakota law as it was required to do under *Erie R. Co.* v. *Tompkins,* 304 U. S. 64? If this case raises a question under the Seventh Amendment, so does every granted motion for dismissal of a complaint calling for trial by jury, every direction of verdict, every judgment notwithstanding the verdict. Fabulous inflation cannot turn these conventional motions turning on appreciation of evidence into constitutional issues, nor can the many diversity cases sought to be brought here on contested questions of evidentiary weight be similarly transformed by insisting before this Court that the Constitution has been violated. This verbal smoke screen cannot obscure the truth that all that is involved is an appraisal of the

---

[27] Printed in S. Rep. No. 711, 75th Cong., 1st Sess. 40.

fair inferences to be drawn from the evidence. Chief Judge Magruder has expressed the common sense of the matter:

> "If an appellate court is of the view that the trial court made an error of judgment in withdrawing a case from the jury, or in entering judgment for the defendant notwithstanding a plaintiff's verdict, a reversal [by a Court of Appeals] is no doubt called for; but we cannot see that anything is gained by blowing up that error of judgment into a denial of the constitutional right to a jury trial as guaranteed by the Seventh Amendment." [28]

Petitioner's insistence that the Court of Appeals ignored or acted at variance with the law of North Dakota is disproved by the citation and discussion of the relevant North Dakota decision in the opinion below. See 252 F. 2d 43, 46. The test of sufficiency applied by the Court of Appeals below is the same test which petitioner asks us to apply, and is the test established by the North Dakota Supreme Court in *Svihovec* v. *Woodmen Acc. Co.*,

---

[28] *Smith* v. *Reinauer Oil Transport, Inc.*, 256 F. 2d 646, 649.

Negligence litigation occupies a substantial portion of the time of federal district judges. "During the last year I myself have calculated with some care that over half the days when I was taking evidence, I was taking evidence in cases involving negligence, either diversity jurisdiction cases, Jones Act, FELA, Federal Tort Claim, or the lot." Judge Charles E. Wyzanski, Jr., Proceedings of the Attorney General's Conference on Court Congestion (1958), 137. Every negligence case, when tried before a jury, necessitates a decision on sufficiency of evidence for submission to a jury. In many cases it is the only issue. We ought not, with due regard to our special functions, encourage the bringing of such cases here. We could not possibly review all the cases sought to be brought here. But if we occasionally review such a case, we discriminate against the others, since no rational classification can justify taking one but not all. That is why all are appealable to the Courts of Appeals.

69 N. D. 259, 285 N. W. 447. "Our conclusion," the opinion below announced, "is that the infliction of two wounds in succession, one in the left side in close proximity to the heart, and the other in the head, cannot be reconciled with any reasonable theory of accident, and that, under the evidence, the question whether the death was accidental was not a question of fact for the jury." 252 F. 2d 43, 47. Thus, as the record was interpreted by the Court of Appeals the evidence fell short of the requirements of North Dakota law for submission to a jury. It might be noted that its interpretation of the record would have required the same result were federal law to determine sufficiency. We have held that "[w]hatever may be the general formulation, the essential requirement is that mere speculation be not allowed to do duty for probative facts, after making due allowance for all reasonably possible inferences favoring the party whose case is attacked." [29]

Alike in Congress and here it has been repeatedly insisted that a question like that raised by petitioner—was there sufficient evidence for submission to a jury—is not proper for review in this Court. The circumstances in the type of situation before us are infinite in their variety. Judicial judgments upon such circumstances are bound to vary with the particularities of the individual situation. The decision in each case is a strictly particular adjudication—a unique case since it turns on unique facts—and cannot have precedential value. Of course it is of interest, perhaps of great importance to the parties, but only as such and not independently of any general public interest.

The considerations that demand strict adherence by the Court to the rules it has laid down for the bar in

---

[29] *Galloway* v. *United States*, 319 U. S. 372, 395.

applying for the exercise of the Court's "sound judicial discretion" in granting a writ of certiorari are not technical, in the invidious sense of the term. They go to the very heart of the effective discharge of this Court's functions. To bring a case here when there is no "special and important" [30] reason for doing so, when there is no reason other than the interest of a particular litigant, especially when the decision turns solely on a view of conflicting evidence or the application of a particular local doctrine decided one way rather than another by a Court of Appeals better versed in the field of such local law than we can possibly be, works inroads on the time available for due study and reflection of those classes of cases for the adjudication of which this Court exists.

The conditions that are indispensable for enabling this Court adequately to discharge the duties in its special keeping cannot be too consciously and too persistently kept in mind. The far-reaching and delicate problems that call for the ultimate judgment of the Nation's highest tribunal require vigor of thought and high effort, and their conservation, even for the ablest judges. Listening to arguments, examining records and briefs, analyzing the issues, investigating materials beyond what partisan counsel offer, constitute only a fraction of what goes into the judicial process of this Court.

For one thing, the types of cases that now come before the Court (as the present United States Reports compared with those of even a generation ago bear ample testimony) require to a considerable extent study of materials outside the legal literature. More important, however, the judgments of this Court are collective judgments. Such judgments presuppose ample time and freshness of mind for private study and reflection in preparation for discussion at Conference. Without adequate study there can-

---

[30] Rule 19, Rules of the Supreme Court of the United States.

not be adequate reflection; without adequate reflection there cannot be adequate discussion; without adequate discussion there cannot be that fruitful interchange of minds which is indispensable to thoughtful, unhurried decision and its formulation in learned and impressive opinions. It is therefore imperative that the docket of the Court be kept down so that its volume does not preclude wise adjudication. This can be avoided only if the Court rigorously excludes any case from coming here that does not rise to the significance of inescapability in meeting the responsibilities vested in this Court.

Adjudication is, of course, the most exacting and most time-consuming of the Court's labors; it is by no means the whole story. In 1925 the Congress, by withdrawing all but a few categories of cases which can come to the Court as a matter of right, gave to the Court power to control its docket, to control, that is, the volume of its business. Congress conferred this discretionary power on the Court's own urging that this was necessary if the proper discharge of the Court's indispensable functions were to be rendered feasible. The process of screening those cases which alone justify adjudication by the Supreme Court is in itself a very demanding aspect of the Court's work. The litigious tendency of our people and the unwillingness of litigants to rest content with adverse decisions after their cause has been litigated in two and often in three courts, lead to attempts to get a final review by the Supreme Court in literally thousands of cases which should never reach the highest Court of the land.[31] The examination of the papers in these cases, to sift out the few that properly belong in this Court from the very many that have no business here, is a laborious

---

[31] In the last three Terms of Court preceding the current Term there were filed, respectively, 1,382, 1,473, and 1,407 petitions for certiorari on the appellate and miscellaneous dockets.

process in a Court in which every member is charged and properly charged with making an independent examination of the right of access to the Court.[32]

Every time the Court grants certiorari in disregard of its own professed criteria, it invites disregard of the responsibility of lawyers enjoined upon the bar by the Court's own formal rules and pronouncements. It is idle to preach obedience to the justifying considerations for filing petitions for certiorari, which Mr. Chief Justice Taft and his successors and other members of the Court have impressively addressed to the bar year after year, if the Court itself disregards the code of conduct by which it seeks to bind the profession. Lawyers not unnaturally hope to draw a prize in the lottery and even conscientious lawyers who feel it their duty, as officers of the Court, to obey the paper requirements of a petition for certiorari, may feel obligated to their clients not to abstain where others have succeeded. No doubt the most rigorous adherence to the criteria for granting certiorari will not prevent too many hopeless petitions for certiorari from being filed. But laxity by the Court in respecting its own rules is bound to stimulate petitions for certiorari with which the Court should never be burdened.

Therefore, ever since Congress, in 1891, established the Courts of Appeals as the customary tribunal for final adjudication of the class of cases to which the present

---

[32] "We have to consider the *certiorari* because it was only after effort that we got a bill passed that makes an appeal to our court dependent upon our discretion in many cases in which until lately it was matter of right. Let it ever be understood that the preliminary judgment was delegated, I should expect the law to be changed back again very quickly with the result that we should have to hear many cases that have no right to our time; as it is we barely keep up with the work." Mr. Justice Holmes, writing under date of August 30, 1929, to Sir Frederick Pollock, 2 Holmes-Pollock Letters (Howe ed. 1941) 251.

belongs, this Court has, as a rule, been resolute in guarding against abuse of its closely restricted discretionary certiorari jurisdiction.   Due regard for our practice and for the vital jurisdictional principle which underlies it, compels the conclusion that this writ of certiorari should never have issued.

However, if we are to review facts, we must establish and adhere to a rational standard of review.   In so doing we cannot ignore the relevance to this task of the many expressions of the impropriety of such review.   If it is unwise for this Court to grant review of cases turning solely on questions of fact, how much less wise to undertake to reassess the record in disregard of the reasoned assessment of the evidence by the Court of Appeals.

> "The same considerations that should lead us to leave undisturbed, by denying certiorari, decisions of Courts of Appeals involving solely a fair assessment of a record on the issue of unsubstantiality, ought to lead us to do no more than decide that there was such a fair assessment when the case is here, as this is, on other legal issues.
>
> "This is not the place to review a conflict of evidence nor to reverse a Court of Appeals because were we in its place we would find the record tilting one way rather than the other, though fair-minded judges could find it tilting either way." [33]

It is the staple business of Courts of Appeals to examine records for the sufficiency of evidence.   To undertake an independent review of the review by the Court of Appeals of evidence is neither our function nor within our special aptitude through constant practice.   Such disregard of

---

[33] *Labor Board* v. *Pittsburgh S. S. Co.*, 340 U. S. 498, 502–503.   See also *Labor Board* v. *American National Ins. Co.*, 343 U. S. 395, 409–410; *McAllister* v. *United States*, 348 U. S. 19, 24 (separate opinion).

sound judicial administration is emphasized by the fact that the judges of the Court of Appeals are, by the very nature of the business with which they deal, far more experienced than we in dealing with evidence, asc: tain-ing the facts, and determining the sufficiency of evidence to go to a jury.[34] If due regard be paid to the weighing of conflicting evidence 'and inferences drawn therefrom by these experienced judges, can it be fairly said that there was no reasoned justification for their conclusion and that their judgment was baseless? If not, we should leave undisturbed the judgment below.[35] After all, we are reviewing the judgment of the Court of Appeals, and it is its judgment that must be subjected to the rule of reason. Comparison of the Court of Appeals' opinion with the record made at the trial manifests scrupulous

---

[34] The Circuit Judges who decided this case have had the following judicial experience:

*Judge Sanborn:* District Court of Minnesota, 1922–1925; United States District Court for the District of Minnesota, 1925–1932; United States Court of Appeals for the Eighth Circuit, since 1932.

*Judge Woodrough:* County Court, Ward County, Texas, 1894–1896; United States District Court for the District of Nebraska, 1916–1933; United States Court of Appeals for the Eighth Circuit, since 1933.

*Judge Johnsen:* Supreme Court of Nebraska, 1939–1940; United States Court of Appeals for the Eighth Circuit, since 1940.

If a claim were made that the Court of Appeals had "departed from the accepted and usual course of judicial proceedings," Rule 19, Rules of the Supreme Court of the United States, that it had, for instance, manifested a strong bias for or against a particular class of litigants, a proper case would be presented for "an exercise of this court's power of supervision." Rule 19, Rules of the Supreme Court of the United States. No suggestion has been made that the decision of the Court of Appeals reflected a bias in favor of an insurance company. On the contrary, animadversion against the complete disinterestedness of the court was disavowed at the bar.

[35] See *Federal Trade Comm'n* v. *American Tobacco Co.*, 274 U. S. 543.

deference to the local law of North Dakota, as pronounced by its Supreme Court, and unmistakable care by the Court of Appeals in considering all the evidence and the inferences which the evidence reasonably yields. Whether we agree or disagree with its evaluation of the evidence, a tolerant judgment can surely not conclude that it does not represent a fair, judicial determination. If we are to consider the merits of the case, I would affirm the judgment of the Court of Appeals.