836 F.2d 548
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
WACHOVIA BANK AND TRUST COMPANY, N.A., Trustee and as
Executor of the Estate of J. Bonner Sams, Jr.,
Plaintiff-Appellant,
v.
AIG LIFE INSURANCE COMPANY, Hartford Accident and Indemnity
Company, Defendants-Appellees.
 No. 87-1625.
 United States Court of Appeals, Fourth Circuit.
 Argued Nov. 2, 1987.
Decided Dec. 22, 1987.
 
 Robert James Lawing (Jane C. Jackson; Petree, Stockton & Robinson on brief) for appellant.
 Thomas Ashe Lockhart (George K. Evans, Jr., Cansler & Lockhart, P.A., F. Fincher Jarrell, Kennedy, Covington, Lobdell & Hickman on brief) for appellees.
 Before WIDENER, WILKINSON, and WILKINS, Circuit Judges.
 PER CURIAM:
 
 
 1
 Wachovia Bank and Trust Company, N.A., as trustee and executor of the estate of J. Bonner Sams, Jr., sought recovery from AIG Life Insurance Company and Hartford Accident and Indemnity Company based on their failure to pay benefits under Sams' two accidental death insurance policies. The district court granted summary judgment in favor of AIG and Hartford. We reverse and remand.
 
 
 2
 On March 31, 1985 Sams died of a gunshot wound to the face suffered while he was holding a pistol in the bedroom of his house in Forsyth County, North Carolina. At the time of his death Sams was a successful sales manager in the Bond Department at Wachovia, well-liked by his fellow employees and his customers. Although his personal life was marked by disappointments associated with his children and occasional intense arguments with his wife, there was no evidence of severe depression or suicidal tendencies.
 
 
 3
 On the morning of his death Sams had a heated argument with one of his daughters at the family home. The daughter left and the argument resumed between Sams and his wife. During the course of the argument, Sams struck her several times, at one point knocking her down. Mrs. Sams was sitting on the floor, leaning against a chair with her head buried in her arms, when she heard Sams walk past her and open the bedside table. She knew that he kept a pistol in the table with which he had threatened her during prior arguments. He also had theatrically offered the weapon to a family member for use in the course of a previous argument. On this occasion Sams said nothing about the gun or his intentions. Mrs. Sams suddenly heard a loud pop, looked up and saw her husband falling backward with "a very, very startled look on his face."
 
 
 4
 Photographs taken at the scene depict the body of Sams, a large man, where he fell. The photographs show that Sams held the gun in an "inverse" position, with his fingers gripping the back of the handle and right thumb inside the trigger guard of the revolver. The pictures show that because of the size of his fingers and thumb, the handle of the weapon was completely covered by his hand and there was virtually no room remaining within the trigger guard with his thumb inserted.
 
 
 5
 A medical examiner concluded that Sams was holding the gun in his right hand with his left hand around the barrel, and that his thumb fired the weapon. He testified that although the gun was fired at close range, the wound was not a contact wound. The gun contained four live rounds, an empty chamber and a spent cartridge under the hammer.
 
 
 6
 The bullet entered Sams' head at the inside corner of his right eye. There was a wound running along the right side of his nose which the pathologist concluded was inflicted by the bullet. "Speckling," small black marks caused by powder grains that burn the skin, was present on the right eyelid and on the bridge of the nose.
 
 
 7
 On a prior occasion the gun had accidentally fired during handling by Mrs. Sams. As a result, it subsequently was kept loaded with an empty chamber to avoid accidental firing. John Sams, the couple's son, testified that he handled the gun shortly before his father's death and may have inadvertently moved the location of the empty chamber from where his father usually kept it. After the shooting, an investigating officer examined and tested the pistol. He testified that the weapon did not work properly. Finally, Myron McBride, a friend of the family, testified that on at least one occasion he observed Sams inspecting the gun to determine if there was still an empty chamber in the cylinder; on that occasion Sams was holding the gun as he held it when he was killed.
 
 II.
 
 8
 As the district court stated on the insurers' motions for summary judgment, "the dispositive consideration is whether a genuine issue of material fact exists regarding whether decedent died as the result of suicide or accident." See Fed.R.Civ.P. 56(c). The burden is on the moving party and the evidence must be assessed in a light most favorable to the party opposing the motion. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir.1979). Rule 56 does not require "that the moving party support its motion with affidavits or other similar materials negating the opponent's claim," Celotex Corp. v. Catrett, 477 U.S. ----, 91 L.Ed.2d 265, 274 (1986), and "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 273.
 
 
 9
 Since jurisdiction here rests on diversity, principles of North Carolina substantive law control. In order to make a prima facie case for benefits under an accidental death policy, a plaintiff must establish (1) the existence of the policy sued on, (2) death of the insured under conditions of coverage, and (3) required notice to the insurer. Williams v. Pyramid Life Insurance Co., 2 N.C.App. 520, 163 S.E.2d 400, 402 (1968). Therefore, the burden was on Wachovia to show that Sams' death was accidental. Moore v. Union Fidelity Life Insurance Co., 297 N.C. 375, 255 S.E.2d 160, 162 (1979). However, "when a beneficiary under an accidental death insurance policy 'offers evidence tending to establish that the insured met his death by unexplained external violence, which is not wholly inconsistent with accident, the presumption arises that the means were accidental.' " Id at 163 (quoting Barnes v. [Home Beneficial Life] Insurance Co., 271 N.C. 217, 219, 155 S.E.2d 492, 494 (1967)).
 
 
 10
 In Moore, the insured's wife sued for benefits under a policy for loss of life due to "accidental bodily injury." Her husband had a history of mental illness, having been hospitalized in institutions three times, the last occurring just two months before his death. He left his home one morning and his body was found the next day lying by his car parked near an unpaved road on a farm he owned. The cause of death was a gunshot wound to the forehead, just over the right eye; powder burns surrounded the wound. The decedent's pistol was found at his feet. His clothing was undisturbed, and his car, money, and personal effects were all intact at the scene. There was no evidence of a struggle or of anyone else having been present. The trial court granted a directed verdict for the insurer but was reversed on appeal. The Supreme Court of North Carolina remarked that the case presented "a close question" but concluded that "[w]hile this evidence would certainly have supported a verdict of suicide, it is not wholly inconsistent with an accidental discharge of the pistol. Plaintiff was therefore entitled to the benefit of the presumption." Id. at 165 (footnote omitted).
 
 
 11
 Footnote 5 in Moore cites Dick v. New York Life Insurance Co., 359 U.S. 437 (1959), wherein the Supreme Court held that under North Dakota law, a widow seeking policy proceeds after her husband's unexplained death from two shotgun wounds was entitled to the benefit of a presumption of accidental death. The evidence at trial established that the deceased had experienced prostate trouble requiring medical treatment. The day of his death was an otherwise routine day in which "[h]e said nothing to indicate that he contemplated doing anything out of the ordinary." Id. at 439. He left the house bundled against the extremely cold weather of the region and began his chores. He was later found in his barn with fatal gunshot wounds to the chest and head. Near him lay his shotgun and a screwdriver. Testimony established that each of the gun's two triggers had approximately a seven-pound pull and it did not accidentally discharge when test-dropped a number of times after the accident. The trial court denied the insurer's motions for a directed verdict and for judgment notwithstanding the verdict after the jury returned a verdict for the wife. The court of appeals reversed concluding that the evidence was not sufficient to support the jury's verdict. The Supreme Court reversed, holding that the North Dakota presumption shifted the burden of proving death by suicide to the insurer and that "reasonable men could conclude that the respondent failed to satisfy its burden of showing that death resulted from suicide." Id. at 447.
 
 
 12
 Although neither Moore nor Dick dealt with summary judgment, the standard before us is essentially the same, for the standard for summary judgment under Rule 56 "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)," Anderson v. Liberty Lobby, Inc., --U.S. ----, 91 L.Ed.2d 202, 213 (1986), and "[t]he standard for granting judgment notwithstanding the verdict is precisely the same as the standard for directing a verdict." 9 C. Wright and A. Miller, Federal Practice and Procedure Sec. 2537, at 599 (1971).
 
 III.
 
 13
 Under the North Carolina presumption of accidental death, "when plaintiff makes a showing of a violent, unexplained death the burden of going forward with evidence shifts to defendant." Moore, 255 S.E.2d at 164. In the case before us, the district court concluded that "[u]nder the facts of the instant case, decedent's death is not unexplained. The circumstances leading to the fatal shooting of decedent are known." Although the district court attempted to distinguish Moore on the basis that in that case the death was unexplained, we find that the circumstances here reveal no more regarding the essential question of the decedent's intent than was evidenced in Moore.
 
 
 14
 REVERSED AND REMANDED.
 
 WILKINSON, Circuit Judge, dissenting:
 
 15
 Someone who points a revolver containing five life rounds directly at his head, holds it with both hands, and pulls the trigger is not engaged in an accidental act. I do not believe this case presents a jury question, and I would affirm the grant of summary judgment for defendants for the reasons stated by the district court.