**PORTERCO, INC., Appellee,**

v.

**IGLOO PRODUCTS CORP., Appellant.**

**No. 90–1992.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 8, 1991.

Decided Feb. 3, 1992.

J. Ray Riley of Houston, Tex., argued (Bobby E. Shepherd, El Dorado, Ark., on the brief), for appellant.

Robert C. Compton and Carol Crafton Anthony, El Dorado, Ark., on the brief, for appellee.

Before JOHN R. GIBSON, BOWMAN, Circuit Judges, and SACHS,* District Judge.

BOWMAN, Circuit Judge.

Porterco Incorporated ("Porterco"), the plaintiff in this diversity case, is an Arkansas corporation whose principal place of business is in Magnolia, Arkansas. The defendant, Igloo Products Corporation ("Igloo"), is a Delaware corporation whose principal place of business is in Houston, Texas. In July 1989, Porterco commenced this action in an Arkansas state court alleging it had been damaged by Igloo's breach of a contract for the sale of goods. Igloo, which had begun its own lawsuit over the matter in a Texas state court, removed Porterco's complaint to the District Court[1] pursuant to 28 U.S.C. § 1441(a) (1988). After removal, Igloo filed a counterclaim alleging that Porterco's own breach of the sales contract entitled Igloo to damages, and the case proceeded to trial. The District Court directed a verdict against Igloo's counterclaim, and the jury awarded Porterco $30,000.

Igloo appeals, contending that the District Court erred by (1) refusing to grant a directed verdict against Porterco's claim, and (2) directing a verdict against Igloo's counterclaim. We affirm.

I

Igloo and Porterco manufacture consumer items; along with other products, Porterco makes "soft" coolers from vinyl and

---

* The HONORABLE HOWARD F. SACHS, Chief United States District Judge for the Western District of Missouri, sitting by designation.

1. The Honorable Oren Harris, Senior United States District Judge for the Western District of Arkansas.

fabric and Igloo makes "hard" coolers from molded plastic. The two companies began doing business in 1986–87. From time to time Igloo purchased soft coolers from Porterco and other vendors for resale under the Igloo trademark. By the time this dispute arose, the parties had completed over thirty transactions and had developed a friendly commercial relationship.

In 1988, Igloo began to negotiate with Tupperware Home Parties ("Tupperware") for a contract to manufacture hard coolers. If Igloo secured this business Tupperware would become Igloo's third-largest account. Tupperware wanted to sell the hard coolers together with soft coolers and apparently expected Igloo to provide both items. According to Lee Eckford, an Igloo employee responsible for purchasing materials Igloo would need to fulfill its Tupperware contract, by June 1988 Igloo "had some prototype samples that were done in a rush to get a conceptual idea approved through Tupperware ... [and] some loose" specifications for the soft cooler. Transcript of Trial ("Tr.") at 322.

Eckford sent Porterco a drawing of the proposed soft cooler, which included:

> the general parameters that Tupperware wanted the soft-sided coolers to meet, mainly the type of fabric and what it was supposed to look like. But nothing determining exactly what it was to look like. That was to be developed over the next several months.

Tr. at 323. Eckford asked Porterco to estimate its price for manufacturing as many as 250,000 soft coolers. Porterco was unable to meet Igloo's suggested price with its standard products. After evaluating the drawing and the degree of assistance it could obtain from other manufacturers, Porterco president Calvin Porter wrote Igloo president Jon Godshall to explain that Porterco was unable to make the soft cooler.

Nevertheless, at the beginning of September 1988, Eckford sent Porterco a prototype of the soft cooler and a list of alterations that Igloo desired the finished product to embody. Eckford asked Porterco to estimate its price for manufacturing at least 300,000 soft coolers as soon as possible. Igloo was also making inquiries at other firms including PGA, a Houston-based company that obtained soft coolers from the Republic of China (Taiwan). Porterco was the only domestic supplier that Igloo contacted regarding the Tupperware project.

After again discussing the project with potential subcontractors, Porterco estimated a price between $5.75 and $5.85 for each soft cooler. When Eckford responded that this price was too high, Porter suggested the use of lesser-quality materials. Porter and Eckford also discussed shipping the coolers in large boxes, thereby lowering Porterco's freight charges.

With these suggestions in hand, Porterco spoke to its own suppliers to see if they could provide the soft cooler's components. When Porterco told Igloo that the changes and new shipping method lowered its price to $4.95 per soft cooler, Eckford told Porter he would propose that Igloo purchase 150,000 soft coolers from Porterco and another 150,000 soft coolers from PGA. Eckford also discussed the possibility of another large amount of the same coolers being ordered from Porterco or another firm in the future. Eckford told Porter that he would put the matter before Godshall.

When these ideas were discussed at Igloo, the company decided to split its requirement for 300,000 soft coolers between Porterco and PGA, which had previously told Igloo that it would only charge $4.00 per soft cooler. Although this price was substantially lower than Porterco's, Godshall agreed with Eckford that at least half of the soft coolers should be ordered from Porterco. Godshall later said this decision resulted from his preference to purchase American goods whenever possible and the fact that Igloo never had ordered products from the Republic of China and therefore was concerned about PGA's reliability. Moreover, Eckford realized that because Porterco was closer to Igloo's Texas facility, Igloo could schedule Porterco's deliveries to begin first, thereby allowing time for overseas shipment from the Republic of China.

On September 8, 1988, Eckford called Porterco on the telephone and gave it purchase order number 03917. According to a practice that Porter testified was common in the industry, Igloo always gave Porterco purchase order numbers by telephone; when Porterco received the number it would immediately begin to fill the order. Any samples or prototypes always were developed or agreed upon beforehand. Indeed, on many past transactions Porterco did not receive an actual purchase order form from Igloo until after it had shipped the goods. Consequently, the day after Porterco received the purchase order number it began to order what Porter later described as "[a] tremendous amount," Tr. at 93, of the materials needed to make the soft cooler according to the prototype and changes he had discussed with Eckford. Porterco also ordered new machines that it needed to make the soft coolers.

Although Tupperware had ordered 300,000 cooler combinations from Igloo in September,[2] the two companies had not settled on a design for the soft cooler. Eckford later testified that on September 8, 1988, he specifically told Porter that changes would be made to the soft cooler's design, and testified that he issued the purchase order number at Porter's request and only to allow Porterco to order the fabric the parties had agreed to use. Porter, however, testified Eckford never indicated that the transmission of the purchase order number was not an order for the cooler the parties had already discussed, and testified that Eckford specifically "instructed" him "to get all the raw materials in, to begin immediately so [Porterco] could start producing" the soft coolers. Tr. at 198.

In October 1988, Porter traveled to Houston, where a trade show was taking place at which he could buy equipment Porterco needed to produce the soft cooler he thought Igloo wanted his company to make. Porter recalled that Porterco "had a lot of the raw materials in the warehouse at that time, and everything had been ordered." Tr. at 98. Porter called on Eckford, along with another Igloo employee responsible for marketing and the company's national sales manager, with regard to other matters of business between the two companies. None of these persons indicated that Porterco would be required to produce a sample soft cooler for Igloo's approval.

Shortly after these visits, however, Igloo told Porterco to produce a sample for Igloo's evaluation. Igloo sent Porterco a second prototype that had numerous changes from the one that had been sent to the company in September. Particularly, the second prototype's fabric was different from that which Porterco had already ordered.[3] Porterco, which allegedly had spent $400,000 ordering material to produce the soft cooler it discussed with Igloo in September, developed the sample using some materials that were unavailable in the United States and had to be provided by Eckford. Due to these changes Porterco asked for—and eventually received—a price ten cents higher than the $4.95 it had originally quoted to Igloo.

Eventually, Porterco was able to produce a sample that met with Igloo's approval. Igloo and Tupperware agreed on a design for the soft cooler in November 1988, and on November 22, 1988, Porterco received

2. Tupperware also acquired an option to purchase an additional 35,000 combinations. Igloo's first delivery was due on March 17, 1989, and delivery was to be completed by the end of May 1989.

3. It appears, however, that Porterco was permitted to proceed with the fabric it had already ordered. A letter written by Godshall to Porter in January 1989 states that: "In the final sample review, Igloo convinced Tupperware to go with the fabric that Porterco had already ordered rather than the fabric sample submitted by the other source in order to expedite delivery." Plaintiff's Exhibit 5 at 2, *reprinted in* Appellant's

Appendix at 76, 77. Porter testified that he ordered the fabric immediately after the purchase order number was transmitted, that the fabric was "held up just getting the color approved for a week or so," and that Porterco received the fabric at the end of October or the beginning of November. Tr. at 199–200. Eckford testified that Igloo and Porterco "had agreed that since ... Porterco had already ordered fabric according to a Tupperware sample swatch that [the companies] would use the color of material that they had on order." Tr. at 332–33.

by fax Igloo's purchase order (on a pre-printed form, with blanks for price, quantity, and other deal-specific terms filled in) for 150,000 soft coolers. That same day Igloo sent a purchase order to PGA for 150,000 soft coolers at a price of $3.89 per cooler. Except as to the terms concerning price, quantity, and time of delivery, the faxed purchase order received by Porterco was identical to the purchase-order terms of thirty-five previous sales contracts between the parties. Igloo was to receive the first shipment of 16,000 soft coolers on December 21, 1988 and receive 16,000 a week until the last delivery of 6,000 on February 22, 1989.

On November 29 and 30 Porterco, citing production delays caused by Igloo's design changes, faxed proposed new delivery schedules to Igloo. Each schedule proposed that Porterco's first delivery would occur on or before December 21, 1988, and would consist of 6,000 soft coolers. The November 30 proposal called for Porterco to increase its deliveries until February 1, 1989, when Porterco would deliver approximately 16,000 coolers each week until Igloo received the entire 150,000 required by the purchase order. Igloo agreed to accept delivery according to the November 30 proposal.

Meanwhile, Igloo was experiencing its own production difficulties. Because the hard cooler's dimensions differed from any of Igloo's standard items, Igloo was required to spend approximately $300,000 on new molds and to acquire fixtures for injecting foam insulation into the molded cooler bodies. Igloo had to prepare a careful schedule to accommodate its Tupperware production and its work on other products, as all these projects would share the same assembly line. Moreover, because the soft coolers were to be placed inside the hard coolers for delivery to Tupperware, it was of great importance to Igloo to receive prompt shipments of the soft coolers. Without the soft coolers available for packing, Igloo would have to incur the extra expense of packing the hard coolers, unpacking them to receive soft coolers, and then repacking the two-cooler sets for shipment to Tupperware.

Porterco did not begin to receive materials in quantities sufficient to begin production until mid-December 1988. A shipping company had agreed to give Porterco a special rate for shipments to Igloo on the condition that each shipment fill an entire "pup." Tr. at 119. Unless this condition was met, Porterco's shipping costs became "prohibitive." *Id.* On December 12, 1988, Porter informed Igloo that the production schedule proposed on November 30 could not be reached and suggested that Igloo authorize Porterco to substitute various materials it had in stock for materials that had been ordered specially for the soft cooler. Eckford testified he called Porter and told him that "as far as [Eckford] was concerned there was plenty of time for him to produce the units and whatever he needed to do, he had to do to meet our commitments." Tr. at 341. As the December 21 deadline approached, however, it became "obvious" to Porter that there was "no way" his company was going to meet the first delivery deadline. Tr. at 121.

Therefore, on December 21 Porter called Godshall to explain why Porterco had not made its first delivery. At trial, the parties disputed the character of this conversation. Godshall claimed that Porter requested Igloo to modify their agreement by purchasing only 78,000 soft coolers and suggested Igloo contact its overseas supplier to obtain the balance of Porterco's original commitment. Godshall claimed he told Porter he would discuss the reduction with Eckford. Porter denied asking for a modification of the agreement. He said he expressed his concern that Igloo be able to meet its commitments to Tupperware; assured Godshall that Porterco could produce the entire order and had enough materials on hand to produce 78,000 coolers; and that he discussed resort to an overseas supplier only as a possibility, on the condition that Porterco not be "stuck with any raw materials." Tr. at 122-23, 225. It is not disputed, however, that during this conversation Porter said his company would ship approximately 5,000 soft coolers the following day.

After this conversation, Igloo and Porterco engaged in a running argument conducted by telephone and fax. Eckford called Porter to say "he hadn't seen the level of commitment that was required of this project from Porterco." Tr. at 126. On December 23, Porter faxed a letter to Eckford that rehearsed the difficulties and expenses Porterco had incurred in connection with Igloo's order, and offered a "reasonable expectation" of Porterco's "projected delivery." Plaintiff's Exhibit 19, *reprinted in* Appellant's Appendix at 156, 157. This letter said a delivery of 5,800 coolers would be made on December 29 and described future deliveries that increased in size *"until all 150,000 units from PO 3917 have shipped!" Id.* (emphasis in original).

Igloo attempted to begin its production of hard coolers on December 24. Employees were brought in and a "shake-down" of Igloo's manufacturing process was performed. Tr. at 279. Porterco did not send its first shipment because the freight company would not have a "pup" available until the following week. Because sending the coolers in any other manner would be more expensive, and because Porterco "didn't feel like that [*sic*] Igloo was working over Christmas," Tr. at 227, Porterco decided to ship the first delivery the following week.

On December 27, Igloo contacted PGA and ordered approximately 3,600 coolers to be delivered by air freight from Taiwan. Igloo did this without contacting Porterco to ascertain the status of Porterco's first delivery. Although Eckford spoke with Porter on the telephone that same day, Eckford said nothing to indicate that Porterco's order would be reduced to 78,000 coolers. The overseas coolers arrived on December 29, and Porterco's first shipment arrived on December 30.

On January 3, 1989, Godshall composed a letter to Porter that rehearsed Igloo's understanding of past events. This letter was faxed to Porterco on January 5, 1989. Regarding his December 21 telephone conversation with Porter, Godshall wrote:

On December 21, you called me to inform me that Porterco had fallen further behind schedule and that you would only be able to produce 78,000 bags rather than the 150,000 quantity agreed to. You informed me that the delays were due to the zipper and webbing suppliers not delivering material to keep you in production over the holidays. You requested that Igloo reimburse Porterco for excess materials you purchased in anticipation of producing 150,000 units rather than 78,000. I informed you that I would have to check on the details with Lee Eckford since I was not aware of the exact expected delivery schedules from both Porterco and the overseas supplier.

Plaintiff's Exhibit 5 at 2, *reprinted in* Appellant's Appendix at 76, 77. Godshall also stated that the day after their phone conversation he directed Eckford to check on Porterco's suppliers to determine whether there had been delays with Porterco's materials and that the suppliers had told Eckford that they already had shipped the materials.

Although Godshall also wrote Porter that his company had "jeopardized" Igloo's contract with Tupperware and that "Lee Eckford will respond ... regarding the acceptability of your proposed delivery schedule once he has been able to evaluate the alternatives," *Id.* at 3, Appendix at 78, this letter contains nothing about an agreed-upon modification of Porterco's obligation to deliver 150,000 coolers. Further, Godshall testified he did not tell Eckford that Porterco had requested such a modification. Eckford, however, had a different memory of Godshall's statements. According to Eckford, Godshall "asked me to look into it and see if we could accommodate Calvin by reducing the quantity to 78,000." Tr. at 345. Eckford said he obeyed Godshall by checking to see if the "overseas people" could produce the remainder of Porterco's original order. Tr. at 346.

On January 6, 1989, Porter called Eckford to discuss the situation. Eckford recalled he told Porter that Igloo had "reduced the quantity to 78,000; the balance was contingent upon his performance." Tr. at 358. Although Porter asked " '[w]hat have you done to us,' " Tr. at 229,

and also asked Eckford for an explanation, Eckford did not say this was being done because Porter had requested it. Tr. at 358.[4] Three days later, Porterco received a purchase order change notice stating that "[t]his revision is issued to adjust the quantity of P.O. # 3917 to 78,000 softside coolers (Tupperware)" and that Igloo expected delivery of this amount "per the schedule of Porterco letter of 12/23/88." Plaintiff's Exhibit 6, *reprinted in* Appellant's Appendix at 80. On the same day Porter faxed two requests that Igloo clarify the notice, particularly with regard to the 72,000–item balance of the original purchase order. Mark Zehnder, Igloo's purchasing manager and Eckford's superior, responded that Igloo would only purchase 78,000 "for now." Tr. at 140. Although at the time it sent the notice Igloo had not contracted with anyone (other than Porterco) as a source of the remaining 72,000 soft coolers, PGA had assured Igloo that it was ready to provide them.

Discussions concerning the possibility of a second agreement for Porterco to produce the 72,000 soft coolers went nowhere because Porterco asked for a price increase. On February 21, 1989, Igloo sent PGA a purchase order for the 72,000 soft coolers at a price even lower than set out in Igloo's purchase order to PGA for the initial 150,000 coolers. Although Porterco did not meet the production schedule it proposed on December 23, 1988, it delivered 78,000 soft coolers that were accepted by Igloo. Although Igloo originally had planned to begin producing 2,000 combination hard and soft coolers a day on December 20, 1988, and although Porterco failed to deliver on December 22–23, there is evi-

dence from which the jury could infer that problems with Igloo's equipment, rather than Porterco's problems in making delivery, delayed the start of Igloo's production until the first or second week of January 1989. Igloo fulfilled its contract with Tupperware, and realized approximately $300,000 in net profits, of which roughly $72,000 resulted from the reduction of Porterco's purchase order and Igloo's purchase of soft coolers from PGA.

## II

 Igloo contends that as a matter of Texas law the District Court erred when it denied Igloo's motion for a directed verdict against Porterco on its claim for damages.[5] Igloo's motion was based on paragraph thirteen of the purchase order. The paragraph states:

Cancellation: ... Buyer reserves the right to cancel all or any part of the undelivered portion of this order if Seller does not make deliveries as specified, time being of the essence of this contract, or if Seller breaches any of the instructions, terms or provisions hereof, including, without limitation, the warranties of Seller.

Plaintiff's Exhibit 3 at 3, *reprinted in* Appellant's Appendix at 72, 74. Igloo argues the District Court erred because the facts show Porterco met none of the delivery schedules agreed upon by the parties; since paragraph thirteen makes time "of the essence," *id.*, Igloo asserts the late deliveries entitled it to cancel the contract.[6] Our review employs the same standard that district courts apply when ruling on a directed verdict motion.[7] We must assume

---

4. Eckford gave conflicting testimony on this point. He initially testified that he told Porter that Igloo was reducing the amount at Porterco's request, but later testified that he did not remember whether he said this. Tr. at 349, 352.

5. Both Arkansas and Texas allow parties to choose the law that governs their contract. Ark. Code Ann. § 4–1–105(1) (Michie 1991 Repl.); Tex.Bus. & Com.Code Ann. § 1.105(a) (West Supp.1991). The purchase order specifies that the governing law will be that of Texas, and the parties do not dispute that the law of Texas is the source of the substantive rules of law that control this case.

6. "'Cancellation' occurs when either party puts an end to the contract for breach by the other." Tex.Bus. & Com.Code Ann. § 2.106(d) (West 1968). A buyer's ability to cancel is discussed in Tex.Bus. & Com.Code Ann. § 2.711 (West 1968).

7. "Lurking in this case is the question whether it is proper to apply a state or federal test of sufficiency of the evidence to support a ... verdict where federal jurisdiction is rested on diversity of citizenship." *Dick v. New York Life Ins.*, 359 U.S. 437, 444–45, 79 S.Ct. 921, 926–27, 3 L.Ed.2d 935 (1959). Neither the Supreme Court nor this Circuit has resolved this issue. *Id.* at

the evidence that supports the non-movant's case is true, give the non-movant the benefit of all reasonable inferences that can be drawn from this evidence, and resolve all direct factual conflicts in the non-movant's favor. *City Nat'l Bank v. Unique Structures*, 929 F.2d 1308, 1312 (8th Cir.1991). The direction of a verdict is proper only when all the evidence points one way and is susceptible of no reasonable inferences that support the non-movant's position. *Dace v. ACF Indus.*, 722 F.2d 374, 375 (8th Cir.1983), *supplemented on other grounds*, 728 F.2d 976 (8th Cir.1984) (per curiam).

▆▆▆▆ When the parties expressly state time is of the essence they are entitled to demand strict performance from one another and to withdraw from the bargain upon non-performance. *Wilson v. Klein*, 715 S.W.2d 814, 822 (Tex.Ct.App.1986); *Miracle Revival Center Move of God Church v. Kindred*, 615 S.W.2d 257, 258–59 (Tex. Civ.App.1981). However:

> Provisions in a contract which specify or limit the time of performance, even where time is of the essence of the contract, may be waived. Further, such a waiver may be express or implied.....
>
> A waiver of the time of performance of a contract will result from any act that induces the opposite party to believe that exact performance within the time designated in the contract will not be insisted upon.

*Laredo Hides v. H & H Meat Products*, 513 S.W.2d 210, 217–18 (Tex.Civ.App.1974) (citations omitted); *accord James Myers & Assocs. v. National Dev.*, 722 S.W.2d 491, 493 (Tex.Ct.App.1986). "Waiver is ordinarily a question of fact and intention is usually a necessary element in determining

the question." *Lee–Emmert v. MacAtee, Inc.*, 410 S.W.2d 489, 491 (Tex.Civ.App. 1966); *accord Siderius, Inc. v. Wallace Co.*, 583 S.W.2d 852, 864 (Tex.Civ.App. 1979). The application of these principles to the evidence leaves no question that the District Court properly denied Igloo's motion.

Tupperware issued its purchase order to Igloo in September 1988. According to Porter, Igloo ordered 150,000 soft coolers from Porterco that same month. Porter testified that the time then projected for Porterco's initial delivery was mid-December 1988. During the last week of November 1988, Porterco proposed other delivery schedules to Igloo. One schedule required Porterco to make a first delivery of 6,000 soft coolers on December 21, 1988 and increase deliveries to 10,000 coolers approximately every seven days. A second schedule, proposed on November 30, retained the first delivery of 6,000 coolers on December 21 but gradually increased deliveries to 16,000 coolers approximately every week. According to Porter, Igloo agreed to this schedule.

On December 12, Porterco contacted Igloo by fax and stated, "[o]ur production levels as set out in our 11/30/88 fax to you ... *cannot be reached.*" Defendant's Exhibit 15, *reprinted in* Appellant's Appendix at 166 (emphasis in original). Porter and Eckford then spoke on the telephone and Eckford insisted that delivery be made as scheduled: "I told him as far as I was concerned there was plenty of time for him to produce the units and whatever he needed to do, he had to do to meet our commitments." Tr. at 341. On December 21, Porter called Godshall to inform him that

---

445, 79 S.Ct. at 926; *City Nat'l Bank v. Unique Structures*, 929 F.2d 1308, 1312 n. 3 (8th Cir. 1991). It appears, however, that the Texas standard for review of a ruling on a directed verdict motion is substantially similar to the federal standard:

> appellate courts must view the evidence in the light most favorable to the [non-moving] party ... and disregard all contrary evidence and inferences. If ... there is any evidence of probative value which raises a material fact issue, then the [motion for a directed verdict should not be granted].

*Qantel Business Sys. v. Custom Controls*, 761 S.W.2d 302, 303–04 (Tex.1988) (citations omitted); *accord Houston v. Mike Black Auto Sales*, 788 S.W.2d 696, 697 (Tex.Ct.App.1990). As we conclude that our analysis and outcome will be the same under either the Texas standard or the substantially-similar federal standard, we do not attempt to resolve the question of which standard governs our review of the District Court's rulings on Igloo's and Porterco's directed verdict motions. *Sutherland v. Elpower Corp.*, 923 F.2d 1285, 1288 (8th Cir.1991).

Porterco could not make the first delivery date and to discuss the possibility that Igloo would take part of the order elsewhere. Porter testified he was "assured by Mr. Godshall that they were running late in production; that—Not to worry about it." Tr. at 123.[8] Similarly, Godshall testified he was assured by Porter that a shipment of coolers would be sent on December 22. On December 23, however, Porter transmitted a message to Igloo containing "a reasonable expectation of our projected delivery," and listing deliveries starting on December 28, 1988. Plaintiff's Exhibit 19 at 2, *reprinted in* Appellant's Appendix at 156, 157.

Porterco's first delivery was shipped on December 28. Igloo accepted this delivery and continued to accept further deliveries (each of which was late) by Porterco until a total of 78,000 soft coolers had been reached. Further, Eckford's testimony does not contain a shred of evidence that the reduction of Igloo's order from 150,000 to 78,000 resulted from Porterco's late deliveries rather than from the lower prices at which the Taiwanese coolers were available. Godshall's testimony displays the same dearth of evidence. Indeed, throughout the trial, Godshall and Eckford maintained that the reduction resulted from a renegotiation of the agreement rather than from Porterco's late deliveries. Reasonable jurors could find that these acts "induce[d Porterco] to believe that exact performance within the time designated in the contract [was] not ... insisted upon." *Laredo Hides*, 513 S.W.2d at 218. Because, therefore, the evidence does not point only one way and is susceptible of reasonable inferences that sustain Porterco's position, the District Court did not err in denying Igloo's motion for a directed verdict based on paragraph thirteen.[9]

### III

Igloo also claims the District Court erred in denying its directed verdict motion under paragraph twenty of the purchase order, which states: "In any case where the Seller may be entitled to damages for defective performance by Buyer, Seller shall not be entitled to lost profits or consequential or incidental damages." Plaintiff's Exhibit 3 at 3, *reprinted in* Appellant's Appendix at 72, 74.[10] In opposition

---

**8.** Godshall's letter to Porter on January 3, 1989, reflects a similar understanding of this telephone conversation. Godshall wrote: "On December 21st, you called me to inform me that Porterco had fallen further behind schedule. ..." Plaintiff's Exhibit 5 at 2, *reprinted in* Appellant's Appendix at 76, 77.

**9.** We note that the purchase order also contains a provision that states:

> [n]o delay or failure by Buyer in insisting on any instructions, terms or provisions herein or exercising any rights hereunder shall operate as a waiver. A waiver of any of the instructions, terms or provisions herein on one or more occasions shall not be construed as a waiver on any future occasion.

Plaintiff's Exhibit 3 at 3, *reprinted in* Appellant's Appendix at 72, 74. Igloo did not argue the issue suggested by this clause before the District Court, nor has it relied upon it before us. We note, however, it is within the jury's power to find that such a provision was itself waived or modified by the parties' agreement or conduct. *See, e.g., Group Hosp. Servs. v. One & Two Brookriver Ctr.*, 704 S.W.2d 886, 888–89 (Tex.Ct. App.1986) (discussing jury findings regarding waiver of Statute of Frauds objection to oral modification of contract and waiver of contract clause forbidding oral modification); *Regent*

*Int'l Hotels v. Las Colinas Hotels*, 704 S.W.2d 101, 104 (Tex.Ct.App.1985) (" 'It is immaterial how the promisor manifests his intention to fulfill the prior duty without the performance of the condition thereof. ... if the undertaking to perform is made plain.' ") (quoting Restatement of Contracts § 88, cmt. c (1932)).

**10.** We agree with Igloo that this clause unambiguously denies Porterco the opportunity to receive incidental damages, consequential damages, or lost profits due to any breach by Igloo. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) ("A contract ... is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning."). By excluding "incidental damages," the paragraph clearly contemplates the definition contained in Tex.Bus. & Com.Code Ann. § 2.710 (West 1968), which:

> include[s] any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach.

Paragraph twenty is not inconsistent with Texas law regarding consequential damages, which are unavailable to a seller. *Nobs Chem., U.S.A. v. Koppers Co.*, 616 F.2d 212, 216 (5th Cir.1980);

to Igloo's motion Porterco's counsel suggested that the clause is unconscionable by arguing, "to now say that there is no way that a plaintiff can recover when the defendant breaches a contract is unconscionable and it's simply not the law." Tr. at 309. The District Court denied Igloo's motion without expressly discussing this issue: "And the Court is convinced that there are sufficient facts to submit this matter to the jury under what I would think would be proper application of the law in a case of this kind." Tr. at 316. Although the District Court instructed the jury regarding the measure of damages, including incidental damages and a victorious plaintiff's right to be put in as good a position as he would have been had the defendant not breached the contract, the jury was not instructed regarding unconscionability. The District Court reiterated its ruling when it denied Igloo's motion for judgment notwithstanding the verdict by, *inter alia,* holding that the effect of paragraph twenty on the availability of incidental damages was "properly ... submitted to the jury as a question of fact." *Porterco v. Igloo Products,* Civ. No. 89–1087 (W.D.Ark. June 8, 1990), Order at 1, *reprinted in* Appellant's Appendix at 63.

■ Throughout these proceedings neither Porterco nor Igloo made a proper argument under the applicable statute, Tex. Bus. & Com.Code Ann. § 2.302 (West 1968). That statute, its accompanying commentary, and the relevant case law make it absolutely clear that the resolution of an unconscionability issue is a question of law:

> This section [2.302] is intended to make it possible for the courts to police explicitly against the contracts or clauses which they find to be unconscionable.... This section is intended to allow the court to pass directly on the unconscionability of the contract or particular clause therein and to make a conclusion of law as to its unconscionability....
>
> \*　\*　\*　\*　\*　\*

*USX Corp. v. Union Pacific Resources,* 753 S.W.2d 845, 856 (Tex.Ct.App.1988); *Gray v. West,* 608 S.W.2d 771, 781 n. 3 (Tex.Civ.App. 1980). Similarly, "lost profits" plainly means the benefits Porterco sought through perform-

The present section is addressed to the court, and the decision is to be made by it. The commercial evidence referred to in [Section 2.302(b)] is for the court's consideration, not the jury's. Only the agreement which results from the court's action on these matters is to be submitted to the general triers of the facts.

Tex.Bus. & Com.Code Ann. § 2.302, comment ¶¶ 1, 3 (West 1968); *and see, e.g., Wade v. Austin,* 524 S.W.2d 79, 85 (Tex. Civ.App.1975) (holding that the unconscionability of a contract or contractual term is a question of law to be resolved by the court alone).

■ "It is," however, "an axiom of trial procedure that counsel must take the initiative in protecting the rights of his clients." *McNeely v. United States,* 353 F.2d 913, 917 (8th Cir.1965). To obtain appellate review of a trial court's acts or omissions a party must have made "known to the [trial] court the action which the party desires the court to take or the party's objection to the action of the court and the grounds therefor." Federal Rule of Civil Procedure 46. Once the District Court had expressed its intention to send the issues raised by Porterco's arguments and paragraph twenty to the jury, it was incumbent upon Igloo to call the court's attention to any incipient error. Igloo made no specific, relevant objection to the District Court's decision to submit this issue to the jury, and has therefore waived appellate review of the District Court's ruling. *See McNeely,* 353 F.2d at 917 ("A party may not stand idly by, watching the proceedings and allowing the Court to commit error of which he subsequently complains."); *Smith v. Town of Orangetown,* 150 F.2d 782, 786 (2d Cir.) (stating, in response to appeal based on contributory negligence instructions, "at this late day it should not be held that contributory negligence was not a question for the jury when nobody suggested at the trial that it ought to be treated otherwise.") (dictum), *cert.*

ance of the contract. Therefore, it may fairly be said that paragraph twenty contemplates that the seller shall not obtain any monetary remedy that might otherwise be available under Chapter Two of the Texas Business and Commerce Code.

*denied*, 326 U.S. 767, 66 S.Ct. 171, 90 L.Ed. 462 (1945); *Fidelity & Casualty v. Mills*, 319 F.2d 63, 64 (5th Cir.1963) (defendant cannot appeal on the ground that the evidence proved an intervening cause of plaintiff's injury, since defendant did not object to the submission of proximate cause to the jury); *Home Indem. v. Williamson*, 183 F.2d 572, 576 (5th Cir.1950) (although waiver of notice requirement may have been a jury issue, party whose attorneys urged its disposition by the court as a matter of law may not complain that jury was precluded from hearing the issue).

▮ Igloo's failure to object prohibits review unless "the error ... is plain error in the sense that it has produced a miscarriage of justice." *Jones v. Board of Police Comm'rs*, 844 F.2d 500, 504 (8th Cir.1988), *cert. denied*, 490 U.S. 1092, 109 S.Ct. 2434, 104 L.Ed.2d 990 (1989). Although there was error in the District Court's ruling, we are not convinced that it resulted in fundamental unfairness or a miscarriage of justice. Therefore, Igloo cannot obtain relief on the basis of this error. *Id.; Airlines Reporting v. Barry*, 825 F.2d 1220, 1225 (8th Cir.1987).[11]

## IV

Finally, Igloo also contends the District Court erroneously granted Porterco's directed verdict motion against Igloo's counterclaim. The counterclaim alleged that Porterco's failure to deliver the first shipment of soft coolers as scheduled forced Igloo to cover by ordering approximately 3,600 coolers to be shipped by air freight from overseas; Igloo sought damages based on the additional costs of shipping by air freight. These costs amounted to approximately $7,452. Our standard of review already has been discussed. Applying that standard, we uphold the District Court's ruling.

▮ When a seller's defective performance forces a buyer to cover, the buyer may obtain damages less "expenses saved in consequence of the seller's breach." *See* Tex.Bus. & Com.Code Ann. § 2.712(b) (West 1968). Assuming *arguendo* that Igloo's view of the case is correct, Porterco's alleged breach gave Igloo the right to terminate their agreement and freed Igloo to purchase the remaining 72,000 soft coolers from the considerably less expensive overseas supplier, thereby realizing a substantial net benefit (some $72,000 of additional profits) that overwhelms the relatively small amount of costs necessary to Igloo's cover effort. The District Court recognized this fact when it held the evidence had not "established that there has been any damage insofar as the company is concerned over this entire matter. They went over a long period of time." Tr. at 457. We agree. Igloo's counterclaim was extinguished by its own necessary assumptions, and the District Court did not err in directing a verdict against that claim. Tex.Bus. & Com.Code Ann. § 2.712(b).

## V

In concluding our review, we record our frustration with the fact that this review has been made far more difficult than necessary by the failure of the parties to give us adequate briefs. This Court, for example, has been unable to glean from the parties' briefs a coherent picture of the factual underpinnings of the case, and thus has found it necessary to comb the entire trial record for that purpose. We do not understand why an appellate court should not be able to rely upon the parties for a sufficiently clear, concise, and complete statement of the evidence to enable the court to put the issues raised on appeal into their proper context. Although the Court always will examine the record to the extent necessary, it is entitled to have clear guidance from the parties in pinpointing those portions of the record that are important to the issues in the appeal. Here, with both parties represented by competent counsel, we do not understand why such guidance was not provided in this case.

---

**11.** Judge Sachs concurs on the theory that paragraph 20 relates to "defective performance" by Igloo, and does not adequately notify Porterco of a limitation of damages under the circumstances of this case.

In addition, we do not understand why the parties did not provide the District Court with adequate Texas legal authority regarding many of the relevant issues. As a result, this Court has been required to expend far more time than ordinarily necessary to examine the District Court's rulings.

In short, the difficulties resulting from the somewhat cavalier manner in which the case has been presented have caused the expenditure of an inordinate amount of judicial time to review the record and examine the District Court's rulings. With this interesting but unnecessarily burdensome task completed, we affirm the judgment entered by the District Court.