**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 20, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

IN RE: ZAGG INC. SHAREHOLDER
DERIVATIVE ACTION

------------------------------------------------------

ALBERT PIKK; DANIEL L.
ROSENBERG, derivatively and on behalf
of ZAGG Inc.,

    Plaintiffs - Appellants,

v.

ROBERT G. PEDERSEN, II; EDWARD
EKSTROM; RANDALL HALES;
BRANDON T. O'BRIEN; CHERYL A.
LARABEE,

    Defendants - Appellees,

and

ZAGG INC.,

    Nominal Defendant - Appellee.

No. 15-4001

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:12-CV-01188-DB)**
_____

Albert Y. Chang, Bottini & Bottini, Inc., La Jolla, California (David W. Scofield, Peters
Scofield, PC, Sandy, Utah, Francis A. Bottini, Jr., Yury A. Kolesnikov, Bottini & Bottini,
Inc., with him on the briefs) for Plaintiffs-Appellants.

Steven M. Schatz, Wilson Sonsini Goodrich & Rosati PC, Palo Alto, California (David J. Berger, Naira Der Kiureghian, and Anne J. Veldhuis, Wilson Sonsini Goodrich & Rosati PC, Palo Alto, California, Gideon A. Schor, Wilson Sonsini Goodrich & Rosati PC, New York, New York, Kevin N. Anderson and Artemis D. Vamianakis, Fabian & Clendenin, Salt Lake City, Utah, Brent R. Baker, D. Loren Washburn, Jennifer A. James, Aaron D. Lebenta, and Shannon K. Zollinger, Clyde Snow & Sessions, P.C., with him on the briefs) for Defendants-Appellees.

_____

Before **HARTZ**, **BACHARACH**, and **PHILLIPS**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Plaintiffs, shareholders of ZAGG Inc., a publicly held Nevada corporation, filed a shareholder-derivative action seeking damages, restitution, and other relief for ZAGG. They alleged that past and present officers and directors of ZAGG violated § 14(a) of the Securities Exchange Act of 1934, breached their fiduciary duties to ZAGG, wasted corporate assets, and were unjustly enriched. The district court dismissed the suit on two alternative grounds: (1) Plaintiffs filed suit before presenting the ZAGG Board of Directors (the Board) with a demand to bring suit and they failed to adequately allege that such demand would have been futile, and (2) the complaint failed to state a claim. Plaintiffs appeal the dismissal on both grounds. Because we deny the challenge to the first ground, we need not address the second.

Plaintiffs urge two reasons why demand would have been futile. First, they allege that three of the six board members (Randall Hales, Cheryl A. Larabee, and Edward D. Ekstrom (the Director Defendants)) had a disqualifying interest in the prospective suit because each was threatened with a substantial likelihood of liability. Second, they

2

allege that each of the Director Defendants was compromised by personal and business relationships among themselves and with Robert Pedersen, former ZAGG Chief Executive Officer (CEO) and a codefendant. We reject these arguments. The Director Defendants were not at substantial risk of liability under any of Plaintiffs' claims because the complaint does not adequately allege that any of them knew that he or she was acting wrongfully, as required by a Nevada statute limiting director liability. And at least a majority of the Board was not compromised by personal or business relationships because Plaintiffs do not challenge three of the six directors and they have failed to adequately allege that Director Defendant Larabee had a compromising relationship.

## I.    BACKGROUND

Pedersen, the founder of ZAGG, served as chairman of the Board and CEO until he resigned in August 2012. The reason for the resignation, and the underlying source of the defendants' alleged liability, is the harm to ZAGG from his forced sales of over two million ZAGG shares that secured his margin account with a broker. A margin account is "an extension of credit by a broker that is secured by securities of the customer." *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1198 (10th Cir. 2015) (internal quotation marks omitted). To protect the broker, the value of the pledged shares must exceed a threshold set by the broker. If the stock value drops below the threshold, the broker has the right to sell shares to cover the customer's debt. *See id.* Such sales can cause the supply of shares to far exceed market demand, leading to a sharp drop in share price and the company's market value. Also, the Securities and Exchange Commission (SEC) has recognized that officers and directors who pledge company stock in margin accounts may

3

be subject to improper influences. *See* SEC Final Rule, Executive Compensation and Related Person Disclosure, 71 Fed. Reg. 53,158, 53,197 (Sept. 8, 2006) ("To the extent that shares beneficially owned by named executive officers, directors and director nominees are used as collateral, these shares may be subject to material risk or contingencies that do not apply to other shares beneficially owned by these persons. These circumstances have the potential to influence management's performance and decisions."). Although these risks from pledging shares have not lead to a prohibition on pledges by corporate officers and directors, the SEC decided in 2006 that the public should be informed when they occur. It amended Item 403(b) of SEC Regulation S-K, 17 C.F.R. § 229.403(b), to require that pledges be publicly disclosed in certain company filings, such as proxy statements and Forms 10-K.[1] *See In re Zagg*, 797 F.3d at 1198.

---

[1] The regulation requires the following information to be disclosed:

> *Security ownership of management.* Furnish the following information, as of the most recent practicable date, in substantially the tabular form indicated, as to each class of equity securities of the registrant or any of its parents or subsidiaries, including directors' qualifying shares, beneficially owned by all directors and nominees, naming them, each of the named executive officers as defined in Item 402(a)(3) (§ 229.402(a)(3)), and directors and executive officers of the registrant as a group, without naming them. Show in column (3) the total number of shares beneficially owned and in column (4) the percent of the class so owned. Of the number of shares shown in column (3), *indicate, by footnote or otherwise, the amount of shares that are pledged as security* and the amount of shares with respect to which such persons have the right to acquire beneficial ownership as specified in § 240.13d-3(d)(1) of this chapter.

17 C.F.R. § 229.403(b) (emphasis added); *see id.* § 229.10 (listing filings with the SEC that must contain the information set forth in § 229.403).

On December 21, 2011 (nine days after Defendant Hales, who was already a member of the Board, had been named as ZAGG's president and chief operating officer (COO)) a margin call on Pedersen's account forced the sale of 345,200 shares. Pedersen reported the sale to the SEC. By December 24, ZAGG's share price had dropped from $8.65 to $6.73. After that sale more than 1.7 million of Pedersen's shares still remained pledged.

On March 15, 2012, ZAGG filed a Form 10-K for fiscal year 2011, and on April 27 it filed a proxy statement soliciting votes for re-election of five board members. Neither the 10-K nor the proxy statement disclosed any pledged shares of Pedersen, as required by § 229.403(b).

On August 14, 2012, a second margin call on Pedersen's account forced the sale of an additional 515,000 shares. This caused Pedersen to resign as Chairman and CEO, as announced in a press release issued August 17. The press release also announced that Larabee was the new Board Chair, that ZAGG would conduct a search for a new permanent CEO, and that Hales would serve as interim CEO. ZAGG stock fell 13% the next trading day. On an August 28 conference call with analysts, Hales stated that Pedersen's departure "was entirely related to the margin call situation that started last December and unfortunately surfaced again two weeks ago." Complaint, Aplt. App. at 42 ¶ 86 (internal quotation marks omitted). On that same call Pedersen—who had satisfied all his margin obligations after a third margin call on August 24—assured investors that "[b]y completely deleveraging my ZAGG stock, I have removed the element of uncertainty around future unwanted sales and have taken a step towards

5

building investor confidence in ZAGG." Dist. Ct. Mem. Decision and Order, Feb. 5, 2014 at 5, (Order), Aplt. App., Vol. 1 at 239. ZAGG also implemented a new policy prohibiting officers and directors from pledging ZAGG shares in margin accounts. A month later, ZAGG signed Pedersen to a one-year, $910,000 consulting agreement. On December 10, 2012, nearly four months after Pedersen resigned, ZAGG appointed Hales as permanent CEO.

Plaintiffs filed the shareholder-derivative complaint at issue in this appeal on June 5, 2013. The complaint alleged that the defendants had failed to disclose Pedersen's "margin call situation" to the public and had executed a "secret succession plan" to replace Pedersen with Hales, Aplt. App., Vol. 1 at 22 ¶ 14, thereby violating § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and breaching their fiduciary duties as directors and officers. Plaintiffs also asserted claims of unjust enrichment and corporate waste based on Pedersen's consulting agreement and the Director Defendants' continued receipt of director compensation even after their alleged transgressions.[2] Plaintiffs did not make a presuit demand on the Board to bring this action, alleging that demand should be excused as futile.

## II.  STANDARD OF REVIEW

Plaintiffs argue that our review of the futility issue is de novo. But, citing *deHaas v. Empire Petroleum Co.*, 435 F.2d 1223, 1228 (10th Cir. 1970), the defendants argue that we review the district court's ruling only for abuse of discretion. We need not

---

[2] The complaint also included a count against former director Shuichiro Ueyama for insider trading. He was dismissed from the case because he did not receive timely service.

6

resolve the dispute because we can affirm the district court's dismissal upon de novo review.

## III. DEMAND FUTILITY

### A. Selection of Governing Law

Plaintiffs' claims arise under federal statutory law (§ 14(a) of the Exchange Act) and the common law (of some jurisdiction, not specified in the complaint). It is not obvious, however, what law should govern the standards for determining whether Plaintiffs were required to demand that ZAGG's directors bring suit before Plaintiffs filed suit themselves. The Federal Rules of Civil Procedure require all shareholder-derivative complaints filed in federal court to "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). But the federal procedural rules cannot establish substantive law. As the Supreme Court wrote in a shareholder-derivative suit bringing claims under § 20(a) of the Investment Company Act of 1940, 15 U.S.C. § 80a-20(a) (ICA):

> [A]lthough Rule 23.1 clearly *contemplates* both the demand requirement and the possibility that demand may be excused, it does not *create* a demand requirement of any particular dimension. On its face, Rule 23.1 speaks only to the adequacy of the shareholder representative's pleadings. Indeed, as a rule of procedure issued pursuant to the Rules Enabling Act, Rule 23.1 cannot be understood to "abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). . . . [T]he function of the demand doctrine in delimiting the respective powers of the individual shareholder and of the directors to control corporate litigation clearly is a matter of "substance," not "procedure."

7

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96–97 (1991) (citations omitted).

"Thus," said the Court, "in order to determine whether the demand requirement may be excused by futility in a derivative action founded on § 20(a) of the ICA, we must identify the source and content of the substantive law that defines the demand requirement in such a suit." *Id.* at 97.

The Court began its analysis by stating that the substantive-law issue is one of federal law:

> It is clear that the contours of the demand requirement in a derivative action founded on the ICA are governed by *federal* law. Because the ICA is a federal statute, any common law rule necessary to effectuate a private cause of action under that statute is necessarily federal in character.

*Id.* That was not, however, the end of the story. The Court then determined that federal common law should adopt the futility law of the state of incorporation of the company on behalf of which the plaintiffs are bringing suit. It reached that conclusion because (1) as a matter "that bears on the allocation of governing powers within the corporation, federal courts should incorporate *state* law into federal common law unless the particular state law in question is inconsistent with the policies underlying the federal statute," and (2) recognition of a futility exception would "not impede the regulatory objectives of the ICA." *Id.* at 108.

We are aware of no federal policy underlying Exchange Act § 14(a) that would distinguish a claim under § 14(a) from, as in *Kamen*, a claim under § 20 of the ICA with respect to futility doctrine. Therefore we look to the law of Nevada, ZAGG's state of

8

incorporation, for the standards that govern the futility exception—at least for Plaintiffs'

§ 14(a) claim.

But what about Plaintiffs' common-law claims?  Because those claims arise under

state law, we ordinarily look to the substantive law (including choice-of-law rules) of the

forum state.  *See Boyd Rosene & Assocs., Inc. v. Kan. Mun. Gas Agency*, 123 F.3d 1351,

1352–53 (10th Cir. 1997) ("[A] federal court sitting in diversity must apply the

substantive law of the state in which it sits, including the forum state's choice-of-law

rules."); *Timmerman v. Modern Indus. Inc.*, 960 F.2d 692, 696 (7th Cir. 1992) ("federal

courts exercising pendent or diversity jurisdiction must apply state law to matters of

substantive law").  Perhaps it would be too problematic to apply two futility standards in

the same case.  As stated in a similar context by *RCM Sec. Fund, Inc. v. Stanton*, 928

F.2d 1318, 1327–28 (2d Cir. 1991), decided before *Kamen*:

> If a state demand requirement were to apply to state claims and a
> federal demand requirement were to apply to federal claims, a
> plaintiff bringing a derivative suit based on a single transaction
> might well be subject to a demand requirement as to one legal theory
> while excused from making a demand as to another legal theory. . . .
> Needless complexity, needless litigation, and perhaps the loss of
> substantive claims would also result from a rule that state law
> governs the demand requirement involving a state claim but federal
> law governs where a federal claim is in issue.

But we need not decide the matter.  The parties agree that Nevada law should apply to the

futility issue (apparently because Utah courts would choose Nevada law as the governing

law); and we see no reason to search for a reason to disagree.  *See TMJ Implants, Inc. v.*

*Aetna, Inc.*, 498 F.3d 1175, 1180–81 (10th Cir. 2007) ("The parties agree that the

9

applicable substantive law is that of Colorado. . . . We therefore assume that this case is governed by Colorado substantive law.").

### B. Nevada Futility Law

Nevada recognizes the right of an individual shareholder to sue on behalf of the corporation through a shareholder-derivative suit. *See Shoen v. SAC Holding Corp.*, 137 P.3d 1171, 1179 (Nev. 2006). But "because the power to manage the corporation's affairs resides in the board of directors," ordinarily "a shareholder must, before filing suit, make a demand on the board . . . to obtain the action that the shareholder desires." *Id.* If the board refuses the demand, the shareholder cannot pursue the litigation unless the refusal was wrongful. *See HPEV, Inc. v. Spirit Bear Ltd.*, No. 2:13-cv-01548-JAD-GWF, 2014 WL 6634838, at \*2 (D. Nev. Nov. 21, 2014). *See generally Levine v. Smith*, 591 A.2d 194, 210–15 (Del. 1991).

If, however, a board is undeserving of the typical deference given to its business judgment, Nevada law does not require a presuit demand. "For instance, there is no point in requiring a party to make a demand for corrective action to officers and directors who are swayed by outside interests, which contaminates their ability to conduct the corporation's affairs." *Shoen*, 137 P.3d at 1180. Would-be derivative plaintiffs therefore need not make a demand on the board if they can show demand futility—that is, show that a sufficient number "of the directors had a disqualifying interest in the demand matter or were otherwise unable to act independently [of someone with such an interest]." *Id.* at 1183 (brackets and internal quotation marks omitted). Demand to a board with an even number of members is futile if at least half are compromised. *See Beam ex rel.*

10

*Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1046 n.8 (Del. 2004) (applying Delaware law; "[i]f three directors of a six person board are not independent and three directors are independent, there is not a majority of independent directors and demand would be futile").

### C. Plaintiffs' Futility Claim

Plaintiffs allege demand futility on two grounds. First, they allege that the Director Defendants (who constituted half the Board) were *interested* in the prospective suit because they may have been found personally liable. In arguing futility, Plaintiffs' opening brief relies on potential liability only on the § 14(a) claim and the fiduciary-duty claim, not on the unjust-enrichment or corporate-waste claims. We will therefore consider futility only as to those two claims. *See Lindstrom v. United States*, 510 F.3d 1191, 1196 (10th Cir. 2007) ("Arguments not raised in an opening brief are waived."). Second, Plaintiffs allege that because the Director Defendants were *controlled* by personal and business relationships among themselves and with former CEO Pedersen, who was also potentially liable, they could not have independently considered a demand to sue.

We address interest and then control.

### D. Exposure of Defendant Directors to Liability (Interest)

Nevada follows two landmark decisions of the Supreme Court of Delaware on demand futility: *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), and *Rales v. Blasband*, 634 A.2d 927 (Del. 1993). *See Shoen*, 137 P.3d at 1184. In particular, Nevada requires that "to show interestedness, a shareholder must allege that . . . the board members would

11

be materially affected, either to their benefit or detriment, by a decision of the board, in a manner not shared by the corporation and the stockholders." *Id.* at 1183 (brackets and internal quotation marks omitted). A director may have such a disqualifying interest if the matter before the board is whether to sue the director, but only if the risk of liability is sufficiently great. That is, "interestedness because of potential liability can be shown only in those rare cases where defendants' actions were so egregious that a substantial likelihood of director liability exists." *Id.* at 1184 (brackets, ellipses, and internal quotation marks omitted).

The likelihood of liability is greatly reduced in Nevada by an "exculpatory" statute that limits the personal liability of corporate directors. Relevant to Plaintiffs' claims, it provides:

> [A] director or officer is not individually liable to the corporation or its stockholders or creditors for any damages as a result of any act or failure to act in his or her capacity as a director or officer unless it is proven that: (a) The director's or officer's act or failure to act constituted a breach of his or her fiduciary duties as a director or officer; and (b) The breach of those duties involved intentional misconduct, fraud or a knowing violation of law.

Nev. Rev. Stat. § 78.138(7). Most important here, the Director Defendants are not liable unless their actions constituted "intentional misconduct, fraud or a knowing violation of law." *Id.*; *see In re Amerco Derivative Litig.*, 252 P.3d 681, 700 (Nev. 2011).

Plaintiffs argue that the exculpatory statute is an affirmative defense and they need not plead its negation to claim futility. They rely on Delaware law. In Delaware a statute authorizes a corporation to include in its articles of incorporation a provision limiting the personal liability of directors for breach of fiduciary duty unless the breach involved

12

certain specified conduct, including breach of the duty of loyalty and "acts or omissions

not in good faith or which involve intentional misconduct or a knowing violation of law."

8 Del. C. § 102(b)(7).  The Delaware Supreme Court appears to have held that the statute

creates an affirmative defense on which the directors bear the burden of persuasion.  *See*

*Emerald Partners v. Berlin*, 726 A.2d 1215, 1223–24 (Del. 1999).  If Nevada law

similarly holds that the state's exculpatory statute creates an affirmative defense, then

Fed. R. Civ. P. 8(c), which requires the defendant to plead affirmative defenses, would

support the proposition that the Director Defendants bear the burden of pleading the

application of the statute in defending against the shareholder-derivative claims.  One

could then argue that the same pleading burden applies to the futility allegation.

In our view, however, for Plaintiffs to prevail on the futility issue, their complaint

had to show that the actions of the Director Defendants were not protected by Nevada's

exculpatory statute.  Several considerations lead to that conclusion.  As we explain

below, (1) in Nevada the plaintiff bears the burden of persuasion to overcome the

exculpatory statute on a claim against a director; (2) the burdens of persuasion and

pleading on an issue are generally on the same party; (3) the policy reasons for requiring

that a matter be pleaded as an affirmative defense do not apply to a director's reliance on

the exculpatory statute; and (4) the federal rule governing pleading in shareholder

derivative actions places the burden on the plaintiff to plead the specifics showing

futility.

To begin with, the burden of persuasion is assigned differently by the Delaware

and Nevada exculpatory statutes.  In Delaware the statute says nothing about which party

13

bears the burden of persuasion;[3] and, as just noted, the state's highest court has said that the director has the burden of proving the facts that provide exculpation. *See id.* In contrast, the Nevada statute explicitly states that the director is not liable to the corporation or its stockholders or creditors "*unless it is proven* that: (a) The director's or officer's act or failure to act constituted a breach of his or her fiduciary duties as a director or officer; and (b) The breach of those duties involved intentional misconduct, fraud or a knowing violation of law." Nev. Rev. Stat. § 78.138(7) (emphasis added). This is a clear allocation of the burden of persuasion to the plaintiff. Because allocation of the burden of persuasion is a matter of substantive law, *see Dick v. New York Life Ins. Co.*, 359 U.S. 437, 446 (1959) ("Under the Erie rule, presumptions (and their effects) and burden of proof are 'substantive' . . . ." (footnote omitted)), we apply Nevada's assignment of the burden in assessing the futility issue here, *see Kamen*, 500 U.S. at 108.

---

[3] 8 Del. C. § 102(b) states that "the certificate of incorporation may . . . contain any or all of the following matters:

. . . .

(7) A provision *eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director*: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) *for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law*; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit. No such provision shall eliminate or limit the liability of a director for any act or omission occurring prior to the date when such provision becomes effective. All references in this paragraph to a director shall also be deemed to refer to such other person or persons, if any, who, pursuant to a provision of the certificate of incorporation in accordance with § 141(a) of this title, exercise or perform any of the powers or duties otherwise conferred or imposed upon the board of directors by this title.

(emphasis added).

Thus, Plaintiffs have the burden of showing a substantial likelihood that the Director Defendants will be held liable despite Nevada's exculpatory statute.

Next, in civil cases the "burden of pleading and burden of proof are usually parallel [because] they are both manifestations of the same or similar considerations." Fleming James, Jr., Burden of Proof, 47 Va. L. Rev. 51, 60 (1961). *See Nader v. de Toledano*, 408 A.2d 31, 48 (D.C. App. 1979) ("The general rule is that a party asserting or pleading an issue has the burden of proof . . . ."); *cf. Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005) ("'The burdens of pleading and proof with regard to most facts have been and should be assigned to the plaintiff who generally seeks to change the present state of affairs and who therefore naturally should be expected to bear the risk of failure of proof or persuasion.'" (quoting 2 John W. Strong, McCormick on Evidence § 337, at 412 (5th ed. 1999))). Hence, Plaintiffs could be expected to bear the burden of *pleading* the absence of exculpation. *But see Palmer v. Hoffman*, 318 U.S. 109, 116–19 (1943) (in diversity case, Fed. R. Civ. P. 8(c) (which lists contributory negligence as an affirmative defense) requires defendant to plead contributory negligence as an affirmative defense even though state law may place on plaintiff the burden of persuasion to negate contributory negligence).

Moreover, we agree with the Third Circuit that in determining whether an issue should be treated as an affirmative defense for purposes of pleading, the critical question (absent a contrary command by statute or rule, such as the list of affirmative defenses in Rule 8(c)) is whether requiring the defendant to plead the matter is necessary "to avoid surprise and undue prejudice by providing the plaintiff with notice and the opportunity to

15

demonstrate why the affirmative defense should not succeed." *In re Sterten*, 546 F.3d 278, 285 (3d Cir. 2008) (internal quotation marks omitted). Here, the Nevada exculpatory statute applies to all claims against directors unless the articles of incorporation provide for greater liability. *See* § 78.138(7). The statute provides ample notice of what the plaintiff will need to prove (and plead) without the necessity of a director's pleading the statute as an affirmative defense.

Further support for requiring Plaintiffs to plead facts establishing the requisites for liability under § 78.138(7) flows from the futility provisions in Fed. R. Civ. P. 23.1 itself. Its pleading requirements, which are designed specifically for derivative actions, mandate that the plaintiff "state with particularity . . . the reasons for . . . not making the effort" to obtain the board of directors' consent to the suit. Fed. R. Civ. P. 23.1(b)(3)(B). If the reason for not making the request is that the directors would face a substantial risk of liability from the suit, the plaintiffs should set forth fully why the directors face liability. That would include why the directors are not protected by Nev. Rev. Stat. § 78.138(7). We note that Delaware, which has a rule of procedure similar to Rule 23.1(b)(3), appears to require as much when plaintiffs in a shareholder-derivative suit claim futility. *See Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) ("Where directors are contractually or otherwise exculpated from liability for certain conduct, then a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts." (internal quotation marks omitted)); *id.* at 139 n.2 (quoting the Delaware rule); *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 62–63 (Del. Ch. 2015); *In re Lear Corp. S'holder Litig.*, 967 A.2d 640,

16

647–48 (Del. Ch. 2008) ("To plead demand futility . . . , because the Lear charter contains an exculpatory provision . . . , the plaintiffs cannot sustain their complaint even by pleading facts supporting an inference of gross negligence; they must plead a non-exculpated claim.").

In short, we hold that the allegations of Plaintiffs' complaint must establish whether, in light of the Nevada exculpatory statute, the Director Defendants faced a substantial risk of liability in this derivative action. Thus, we now turn to whether Plaintiffs alleged with particularity facts showing a substantial likelihood that Defendants engaged in "intentional misconduct, fraud or a knowing violation of law." Nev. Rev. Stat. § 78.138(7)(b). We can rule out fraud because Plaintiffs disclaim any allegations of fraud. As for the terms *knowing violation* and *intentional misconduct*, we believe that both require knowledge that the conduct was wrongful.

We recognize that in some contexts courts interpret *knowingly* in a limited way, requiring only "factual knowledge as distinguished from knowledge of the law." *Bryan v. United States*, 524 U.S. 184, 192 (1998) (internal quotation marks omitted); *see id.* ("[T]he term 'knowingly' does not necessarily have any reference to a culpable state of mind or to knowledge of the law."). The interpretation of *intentional* may be similarly limited, requiring only that the action be deliberate, regardless of whether the actor appreciated that it was misconduct. *See Wright v. Municipality of Anchorage*, 590 P.2d 425, 426 (Alaska 1979) (affirming jury instruction stating that "[t]o constitute criminal intent it is not necessary that there should exist an intent to violate the law. Where a person intentionally does that which the law declares to be a crime, he is acting with

17

criminal intent, even though he may not know that his act or conduct is unlawful."); *People v. Hill*, 166 Cal. Rptr. 824, 825 (Cal. App. Dep't Super. Ct. 1980) (defendant guilty for an *intentional* act even if he "did not know his actions were unlawful, or even if he did not intend to violate the law"); *cf. United States v. Manatau*, 647 F.3d 1048, 1050 (10th Cir. 2011) ("[A] person acts intentionally if he acts purposely or had as a conscious object to cause a particular result." (internal quotation marks omitted)).

But courts have also interpreted *knowingly* and *intentionally* more expansively, to require knowledge of wrongfulness. *See, e.g.*, *Liparota v. United States*, 471 U.S. 419, 420, 434 (1985) (to be guilty of *knowingly* acquiring or possessing food stamps in a manner not authorized by the governing statute or regulations, defendant must know that the conduct was unauthorized); *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1220 (11th Cir. 2010) ("In order to demonstrate intentional misconduct [to establish liability for punitive damages], the plaintiff must show the defendant had actual knowledge of the wrongfulness of the conduct . . . ." (internal quotation marks omitted)); *Cohen v. United States*, 378 F.2d 751, 754 n.1, 757 (9th Cir. 1967) (statute stating that "[w]hoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers" is not violated unless defendant knew of the statutory prohibition); *State v. Peters*, 253 P. 842, 846 (Idaho 1927) ("The word 'intentional,' as used in penal laws, is held to import evil intent and unlawful purpose."); *S.S. LLC v. Review Bd. of Indiana Dept. of Workforce Dev.*, 953 N.E.2d 597, 602 (Ind. Ct. App. 2011) (unemployment claim: "To have knowingly violated an employer's rule, the employee must know of the rule and must

18

know that his conduct violated the rule."); *Still v. Comm'r of Employment & Training*, 672 N.E.2d 105, 112 (Mass. 1996) (unemployment claim: "'*knowing violation*' requires an intent to violate the law, and not merely an intent to commit the act that is a violation.").

The latter meaning is the one that makes the most sense here. The purpose of the exculpatory statute is to limit the liability of corporate directors. Under the narrower interpretations of *intentional* and *knowing* that do not require knowledge of wrongfulness, a director would not be protected so long as the director knew what his or her actions were—such as signing a document with knowledge of its contents. But that state of mind would be present for virtually any conduct that could lead to the director's liability to the corporation or its stockholders or creditors. The exculpatory statute would be an empty gesture. To give the statute a realistic function, it must protect more than just directors (if any) who did not know what their actions were; it should protect directors who knew what they did but not that it was wrong. In any event, we need not pursue whether something less than actual knowledge of the wrongful nature of the conduct may suffice in some circumstances because Plaintiffs do not press the point. The Director Defendants' appellate brief asserted that they are liable only if they knew their conduct to violate the law, and Plaintiffs did not contest the point in their reply brief.

We now consider whether Plaintiffs sufficiently pleaded that the Director Defendants knew their conduct to be wrongful. We find no error in the district court's holding that they did not. Plaintiffs alleged that the Director Defendants faced a substantial likelihood of liability under Exchange Act § 14(a) and the common law

19

governing fiduciaries by failing to disclose Pedersen's pledges and the alleged succession plan. We first address the pledges, then the alleged succession plan.

### i. Failure to Disclose Pedersen's Margined Stock

SEC regulations require a company's proxy statements to "indicate, by footnote or otherwise, the amount of shares that are pledged as security" by its officers and directors. 17 C.F.R. § 229.403(b); *see id.* § 229.10(a)(2). And it is a violation of Exchange Act § 14(a) to solicit a proxy in violation of SEC regulations, including § 229.403(b). *See* 15 U.S.C. § 78n(a)(1). ZAGG's April 27 proxy statement did not report Pedersen's margined stock, and Plaintiffs assert that this violation of § 14(a) exposed the Director Defendants to a substantial likelihood of liability. We can assume without deciding that Plaintiffs adequately pleaded that the Director Defendants knew of Pedersen's margin pledges. What is missing, however, is an adequate basis in the complaint for an inference that the violation was knowing or intentional—that is, that the Director Defendants knew that such pledges had to be disclosed.

Plaintiffs urge that such knowledge is reasonably inferred from the pleaded facts that all three Director Defendants "reviewed, approved, and signed [ZAGG's] filings with the SEC," Aplt. App., Vol. 1 at 61 ¶ 154, and that Larabee and Ekstrom, as members of the audit committee, were "responsible for overseeing the integrity of ZAGG's financial statements," *id.* at 59 ¶ 149. The district court properly refused to infer knowledge from these allegations. We doubt that board members are expected to know the minutiae of SEC regulations. We think it significant that the Delaware courts, whose experience and expertise in such matters is widely recognized, *see Delaware Coal. for*

20

*Open Gov't, Inc. v. Strine*, 733 F.3d 510, 524 (3d Cir. 2013); *Swope v. Siegel-Robert, Inc.*, 243 F.3d 486, 496 (8th Cir. 2001), do not think they are. Delaware cases do not infer knowledge of detail (factual or legal) merely from committee membership or execution of SEC filings, but require specific allegations from which one can infer knowledge. For example, in *Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003), the plaintiffs alleged that the board knew of the company's improper accounting practices. *See id.* at 496–97. The court refused to infer such knowledge because the complaint did not contain "well-pled, particularized allegations of fact detailing the precise roles that these directors played at the company, the information that would have come to their attention in those roles, and any indication as to why they would have perceived the accounting irregularities." *Id.* at 503. In *Wood*, 953 A.2d at 139, plaintiffs alleged that defendant board members breached their fiduciary duty to value certain assets properly, in violation of the company's internal policies, accounting standards, and federal law. To support the claim that the defendants knew their actions to have been wrongful, the plaintiffs alleged that the defendants had executed the company's financial reports and served on its audit committee. *See id.* at 142. The court, however, ruled that the complaint did "not plead with particularity the specific conduct in which each defendant 'knowingly' engaged, or that the defendants knew that such conduct was illegal." *Id.* It said that "Delaware law on this point is clear: board approval of a transaction, even one that later proves to be improper, without more, is an insufficient basis to infer culpable knowledge or bad faith on the part of individual directors." *Id.* It could not infer knowledge from the plaintiffs' allegations because "[t]he Board's execution of [the

21

company's] financial reports, without more, is insufficient to create an inference that the directors had actual or constructive notice of any illegality." *Id.* In particular, it held that to infer knowledge from membership on an audit committee would run "contrary to well-settled Delaware law." *Id.* In short, "[a]s numerous Delaware decisions make clear, an allegation that the underlying cause of a corporate trauma falls within the delegated authority of a board committee does not support an inference that the directors on that committee knew of and consciously disregarded the problem." *South v. Baker*, 62 A.3d 1, 17 (Del. Ch. 2012).

Plaintiffs quote the ZAGG audit committee charter, but fail to explain how it compels a conclusion of knowledge. To be sure, one quoted provision states that "[t]he Audit Committee shall comply with the relevant rules and regulations of the SEC." Complaint, Aplt. App., Vol. 1 at 35 ¶ 51. But it would be too much of a stretch to read this as requiring the committee members to have detailed knowledge of all SEC regulations. Corporations have lawyers and accountants for that purpose. Who would take on that responsibility as a board member? As was true in *Wood*, 953 A.2d at 142, "the Complaint alleges . . . violations of federal securities . . . laws but does not plead with particularity the specific conduct in which each defendant 'knowingly' engaged, or that the defendants knew that such conduct was illegal." [4]

---

[4] Plaintiffs argued to the district court that the secret succession plan was itself evidence that the Director Defendants knew of the "illicit nature" of Pedersen's pledges. They have dropped this argument on appeal, which is just as well, as the allegation of a secret succession plan is implausible.

Plaintiffs' pleadings likewise fail to show that the Director Defendants knew that nondisclosure of the pledges violated a common-law fiduciary duty. Indeed, that may have been an impossible task, given the apparent lack of support for the existence of any such duty. The only case in point that we have found states the contrary. *See Burekovitch v. Hertz*, No. 01-cv-1277 (ILG), 2001 WL 984942, at *9 (E.D.N.Y. July 24, 2001) ("While a controlling shareholder's decision to commit large quantities of his stock as security in margin trading undoubtedly has the potential to affect the price of that stock, plaintiff has not and cannot allege an affirmative duty imposed by common law to keep the public appraised of such a decision.").

### ii. Failure to Disclose Succession Plan

Plaintiffs allege that the Defendant Directors failed to disclose their secret plan to replace Pedersen by Hales as CEO. But there is nothing wrongful about failing to disclose the nonexistent, and Plaintiffs did not adequately allege the existence of such a plan.

According to Plaintiffs' opening brief, the Director Defendants decided in December 2011 to remove Pedersen as CEO and Chairman and make Hales the CEO but they deliberately concealed this information because ZAGG had repeatedly informed investors that its success depended on Pedersen's skill and experience. They allege that "the hiring of Hales was a direct response to Pedersen's margin call situation, marking the initial step of the secret succession plan," Aplt. Br. at 36, and that the plan was concealed in a press release of December 12, 2011, and a Form 8-K filed on December 16 which misleadingly stated that Hales would serve only as President and COO and that

23

Pedersen would continue as CEO and Chairman of the Board. In support of their secret-plan theory, Plaintiffs point to the "temporal proximity" between the first margin call and Hales's being named President and COO, Aplt. Br. at 36, and to Hales's statement in August 2012 that from the outset he had worked with Pedersen to "identify and establish corporate objectives" and Pederson had "handed [over] much of the responsibilities for the day-to-day operations," *id.* at 38 (internal quotation marks omitted).

This theory is far-fetched. The complaint alleges no facts indicating that the Board knew of Pedersen's margined stock before the first margin call, and that came nine days *after* ZAGG's announcement that Hales would become president and COO, which certainly came only after serious discussions with Hales about assuming the positions. Plaintiffs' temporal-proximity argument makes no sense if the alleged cause (knowledge of the margined stock) occurred *after* the effect (bringing in Hales to take over ZAGG). We also see nothing remarkable about Hales's disclosure in August 2012 of the nature of his work when he took office at ZAGG in December 2011. No one should be surprised if the president/COO discusses corporate objectives with the CEO and Board chairman or if the president/COO takes over day-to-day responsibilities.

And even if the Board knew of the margined stock before hiring Hales, Plaintiffs' theory would ascribe very peculiar thinking to the Board members. Why would the Board decide to deal with Pedersen's margined stock by looking for a successor rather than working on a plan for an orderly sale of that stock to avoid the bad publicity of a margin call? And after the publicity from the first margin call had damaged Pedersen's favorable image, what would be the public-relations advantage of keeping him on as

24

CEO or the downside of disclosing the succession plan? Why court a further reputational blast from future margin calls, particularly if the Board was not going to make it a condition of Pedersen's remaining as CEO that he eliminate his margin debt? Why wait until four months after Pedersen's resignation to appoint Hales as permanent CEO if that had already been decided a year earlier? Someone might be able to conceive of answers to these questions, but Plaintiffs' secret-plan theory is too speculative to support their futility claim.

### E. Lack of Independence

Finally, Plaintiffs claim that they did not need to demand action by the Board before filing suit because there was not a Board majority independent of influence from interested persons. *See Shoen*, 137 P.3d at 1183 ("[D]irectors' discretion must be free from the influence of other interested persons."). The independence inquiry asks whether a board member was "incapable, due to . . . domination and control, of objectively evaluating a demand." *Brehm v. Eisner*, 746 A.2d 244, 257 (Del. 2000). Plaintiffs contend that three ZAGG directors were not independent of each other or of Pedersen. Because Plaintiffs do not challenge the independence of the other three of the six board members, our inquiry is complete if their allegations against any of the three challenged directors are inadequate. *See Beam*, 845 A.2d at 1046 n.8 (Del. 2004) (demand is excused if there is not a majority of independent directors). In this case we need go no further than Defendant Larabee.

Plaintiffs' allegation of Larabee's lack of independence fails on two grounds. First, were Larabee controlled by another, such control would compromise her ability to

consider a demand only if the person controlling her had an interest in the suit. *See*

*Brehm*, 746 A.2d at 258 (because CEO was disinterested, it is irrelevant which directors

were independent of him). But we have already ruled that none of the Director

Defendants were interested in the suit because none faced a substantial likelihood of

liability. That leaves Pedersen as the only potentially interested Defendant. Plaintiffs did

not, however, allege that Pedersen controlled Larabee; as to Larabee, Plaintiffs argue

only lack of independence from Hales.[5]

Second, the sole ground alleged for Larabee's lack of independence from Hales is

that they served on another company's board together. This is hardly sufficient to

establish the requisite control. Personal or business relationships may compromise

objectivity but only if they are "of a bias-producing nature. Allegations of mere personal

friendship or a mere outside business relationship, standing alone, are insufficient."

*Beam*, 845 A.2d at 1050. Although the Delaware Supreme Court has acknowledged "the

structural bias common to corporate boards throughout America, as well as the other

unseen socialization processes cutting against independent discussion and decision

making in the boardroom," *Aronson*, 473 A.2d at 815 n. 8, it nonetheless requires

allegations of "specific facts pointing to bias on a particular board" to demonstrate

demand futility. *Id.* For example, allegations that board members "moved in the same

---

[5] The Complaint alleged that Larabee lacked independence because she received substantial compensation in her role as a board director and would not want that jeopardized. But because Plaintiffs do not pursue this allegation on appeal, we do not consider it. *See Adler v. Wal-Mart*, 144 F.3d 664, 679 (10th Cir. 1998). We also do not consider Plaintiffs' assertion, raised for the first time in their reply brief and without any record support, that Hales and Larabee shared a longstanding friendship. *See id.*

social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friends'" are insufficient to excuse demand. *Beam*, 845 A.2d at 1051. Plaintiffs' lesser allegation here—merely that Larabee served on a separate board with Hales—must also fall short. *See also Orman v. Cullman*, 794 A.2d 5, 27 (Del. Ch. 2002) ("The naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence."); *Highland Legacy Ltd. v. Singer*, No. Civ.A. 1566-N, 2006 WL 741939, at *5 (Del. Ch. Mar. 17, 2006) (rejecting allegation of lack of independence that was "based solely on the alleged facts that [defendant directors served together] on the boards of other companies"). Plaintiffs have failed to plausibly allege lack of independence.

## IV.    CONCLUSION

Because Plaintiffs failed to adequately plead that presuit demand on the Board would have been futile, we AFFIRM the district court's dismissal of the complaint.